## SINGLETON *v.* BANK OF MONTICELLO.

1. Though mere knowledge by a lender of money that the borrower intends to use it for an illegal or immoral purpose will not prevent a recovery of the money loaned, yet if the lender in any manner aids the borrower in carrying into effect the unlawful design, or participates therein, he can not recover. The allegations embraced in those portions of the defendant's answer which

were stricken on demurrer, taken all together, brought the defense thereby set up within the second branch of this rule.

2. A bank, by bringing an action upon a contract made in its behalf by one of its officers, ratifies his action in making the contract, and is in law chargeable with knowledge of whatever he knew at the time of so doing.

Argued May 3, — Decided May 22, 1901.

Foreclosure of mortgage. Before Judge Hart. Putnam superior court. September 25, 1900.

*Turner & Preston*, for plaintiff in error.
*J. D. Kilpatrick*, contra.

LEWIS, J. The Bank of Monticello brought its petition against Singleton, to foreclose a mortgage which he had given to secure a note of $300. Singleton filed a plea in which he alleged, among other things, that the consideration of the note and mortgage was "illegal, void, and contrary to public policy, being for money loaned to defendant in aid of, to promote, and to further a gaming transaction." The plea describes in detail the events leading up to the loan by the bank to Singleton, and from this narrative it appears that on the day the loan was made the defendant went to the bank and made an unsuccessful attempt to borrow $300, intending to use $200 of the amount in depositing "margins" with his broker for the purchase of cotton futures. Later, accompanied by his broker, Benton, who was a director of the bank, he again visited the bank, and the two together had a conversation with the cashier, at which time it was made clear to that official that the purpose of the desired loan was to obtain money with which to buy cotton futures through the agency of Benton, the broker; and after this conversation, and as a result of Benton's persuasion, the cashier consented to loan the money requested to the defendant, taking his note secured by a mortgage on realty. When the defendant sought to withdraw from the bank the remainder of his discounted note over and above the $200 which he intended to deposit with Benton as margins, amounting to $65, the cashier refused to allow him to do so, informing him that the entire amount of the discounted note had been turned over to Benton to be placed on the cotton-future transaction. This, it is alleged, was without the defendant's consent or authority, and on account of this unauthorized conduct he was unwillingly forced to go deeper into the speculation than he had intended. The bank only consented to make the loan to the defendant at the earnest

solicitation of Benton, one of its directors, upon information that the money was to be used in the purchase of cotton futures, the control of which would be in Benton's hands, and "it looked to be reimbursed out of the proceeds of the illegal speculation." It is expressly alleged that the bank aided in and furthered the consummation of the illegal transaction set out. To the allegations of the plea, the substance ·of which we have set forth, the plaintiff demurred on the grounds that they did not constitute a good defense in law; that, even if the plaintiff furnished the defendant with money with which to engage in a gambling venture, and aided and promoted the gambling venture, the defendant was bound in law to refund the money so furnished; that it was not set out with sufficient certainty in what manner the plaintiff aided and promoted and furthered the gambling transaction; and that the dealings between Benton and the bank were transactions inter alios, the plaintiff being no party thereto and in no event bound thereby. This demurrer was sustained by the trial judge, who, in an opinion accompanying his order, placed his decision upon the theory that the knowledge of the cashier as to the intention of the borrower to use the money loaned him for an illegal purpose was not imputable to the bank. The case then went to the jury, who found a verdict for the plaintiff. The defendant's motion for a new trial was overruled, and he excepted.

1. Section 3537 of the Civil Code declares: "A bare contingency or possibility can not be the subject of sale, unless there exists a present right in the person selling, to a future benefit; so a contract for the sale of goods to be delivered at a future day where both parties are aware that the seller expects to purchase himself to fulfill his contract, and no skill and labor or expense enters into the consideration, but the same is a pure speculation upon chances, is contrary to the policy of the law, and can be enforced by neither party." The rulings of this court are uniform in holding that contracts involving a speculation in "futures" are illegal as contrary to public policy, and can not be enforced. It is only necessary to refer in passing to some of the principal cases on this point. See *Branch* v. *Palmer*, 65 *Ga*. 210; *Thompson* v. *Cummings*, 68 *Ga*. 124; *Porter* v. *Massengale*, 68 *Ga*. 296; *Cunningham* v. *Bank*, 71 *Ga*. 400; *Bank* v. *Cunningham*, 75 *Ga*. 366; *Clark* v. *Brown*, 77 *Ga*. 606; *Walters* v. *Comer*, 79 *Ga*. 796; *Dancy* v. *Phelan*, 82 *Ga*.

243; _Lawton_ v. _Blitch_, 83 _Ga._ 663; _Alexander_ v. _State_, 86 _Ga._ 246; _Benson_ v. _Warehouse Co._, 99 _Ga._ 303; _Cothran_ v. _W. U. Tel. Co._, 83 _Ga._ 25; _Moss_ v. _Bank_, 102 _Ga._ 808. It requires no argument, then, to show that, as between Singleton and Benton, the alleged transaction set forth in the plea of the defendant was illegal and void as against public policy. But, conceding the truth of the allegations in the answer, how was the bank affected by the knowledge of its cashier that the money advanced to Singleton was borrowed for the illegal purpose of speculating in cotton futures ? There is no Georgia case exactly in point, and we have been compelled to resort to the adjudications of the courts of other States for aid in determining this question. The rule as laid down in 14 Am. & Eng. Enc. L. (2d ed.) 641, is as follows: "In the absence of special statutory provision, one who lends money to become the absolute property of the borrower, at his own disposal, to be repaid by the borrower, can enforce such repayment even though such lender knows that such borrower intends to make use of the borrowed property in gambling. Where the understanding between the borrower and lender was that the money should be used for gambling, the lender can not recover." A large number of cases are cited in support of the text. There are some cases which appear at first glance to hold to the contrary, but in nearly all of them it will be found that they arose under special statutes relating to the lending of money with knowledge that it should be used for an illegal purpose. The case which to our mind most clearly and logically states the rule of law upon the subject is Waugh _v._ Beck, 114 Pa. St. 422, in which the following language is used: "It is not enough to defeat recovery by the lender, that he knew of the borrower's intention to use it in a gambling transaction, in purchasing commodities on margin; he must have known that the borrower was purposing such use of the loan and must have been implicated as a confederate in the transaction though not necessarily for gain." See also Corbin _v._ Wachhorst, 73 Cal. 411; Longnecker _v._ Shields, 1 Colo. App. 264; Sondheim _v._ Gilbert, 117 Ind. 71, s. c. 10 Am. St. Rep. 27; Green _v._ Collins, 3 Cliff. 494; Gaylord _v._ Soragen, 32 Vt. 110; Lurton _v._ Gilliam, 1 Scam. (Ill.) 577. The case of Jackson _v._ Bank, 125 Ind. 347, which is squarely in point, states the principle as follows: "Mere knowledge on the part of a person loaning money that the borrower intends to use it by engaging in the purchase of

options on grain in the market of another State, or investing in wagering or gambling contracts, will not defeat a recovery. In order to defeat a recovery it must appear that the person loaning the money did something more than loan the money in furtherance of the deal, or in aid of the illegal transaction." The facts in the case of *Baker* v. *Magrath*, 106 *Ga.* 419, are very similar to those in the case at bar. The principle now under consideration, however, was not ruled upon in that case, the question of the sufficiency of the evidence being alone considered in determining whether or not the lower court erred in directing a verdict for the plaintiff. It will be observed, however, that in discussing the evidence in the opinion on page 421, the following language is used: " Besides, it does not appear from the testimony that, under the contract between the parties, Magrath had any interest whatever in the profits or losses which Baker might make or sustain in the course of the speculation." Thus, although the principle is not directly considered, the language of the court would seem to indicate that a decision of that issue would depend largely upon whether or not the lender was pecuniarily interested in the result of the illegal transaction.

Applying what has been said to the present case, it is clear that if the Bank of Monticello loaned its money to Singleton absolutely, without concerning itself as to the disposition which he might make of it, the knowledge of its cashier, who was its authorized agent, that Singleton was borrowing the money for the sole purpose of engaging in a gaming transaction would not, without more, vitiate its claim against him. A plea which set forth no more than this would have been properly stricken on demurrer. The plea in the present case, however, does not stop at this. It goes further and alleges that the bank was active in furthering the alleged illegal speculation. It avers that after accepting his security for the borrowed money, only a part of which he desired to invest in cotton futures, the cashier refused to allow him to draw the remainder of the money over and above that portion, but informed him that the entire amount of the discounted note had been sent to his broker, Benton. This, he asserts, was entirely without his authority. Benton likewise refused to let him have the surplus over the amount which he desired to place for speculation. These allegations, we think, are clearly sufficient to make out, if sustained, a case of pernicious activity on the part of the bank in furthering the gaming transaction

in question, such as would render its note and mortgage void. See generally, upon this subject, 15 Am. & Eng. Enc. L. (2d ed.) 987, and cases cited.

2. The court below, in our opinion, erred in holding that the knowledge of the cashier as to the illegal use to which Singleton intended to put the money borrowed was not imputable to the bank. It must be borne in mind that the bank was the plaintiff below, seeking to recover upon a contract which was made for it by its cashier. It would be absurd to say that it can take advantage of his act and at the same time repudiate his knowledge of the attendant circumstances. It is not necessary to decide whether or not, under other circumstances, the bank would be chargeable with the knowledge of its cashier in a transaction of this kind. By bringing an action upon the contract made by him in its behalf, it ratified his action in making the contract, and it is in law chargeable with knowledge of whatever he knew at the time the contract was made. In view of the opinions here announced, we send the case back to be heard upon the plea as presented in the record before us.

*Judgment reversed. All concurring, Little, J., specially.*