**GOLD BOND STAMP COMPANY OF GEORGIA, Plaintiff,**

v.

**BRADFUTE CORPORATION, Defendant.**

No. 65 Civ. 2933.

United States District Court
S. D. New York.
July 30, 1969.

---

Cleary, Gottlieb, Steen & Hamilton, New York City, for plaintiff; Joseph Chase, Paul N. Roth, New York City, of counsel.

Bleakley, Platt, Schmidt, Hart & Fritz, New York City, for defendant; Thomas B. Gilchrist, Jr., New York City, of counsel.

## OPINION

TENNEY, District Judge.

This is an action to recover damages for an alleged breach of contract brought by the Gold Bond Stamp Company of Georgia (hereinafter referred to as "Gold Bond"), a company engaged in the licensing of trading stamps, against the Bradfute Corporation (hereinafter referred to as "Bradfute"), organized for the purpose of creating, distributing and operating sales stimulation games for businesses. Jurisdiction of this action, pursuant to Title 28, United States Code, Section 1332(a) (1), is founded upon diversity of citizenship and an amount in controversy exceeding $10,000.00.

Gold Bond, a Georgia subsidiary of the parent company, was incorporated in 1960 for the purpose of operating the Gold Bond Stamp Plan in the southeastern region of the United States. Specifically, the Gold Bond Stamp Plan is a program by which retail stores, licensed by Gold Bond, distribute Gold Bond trading stamps with merchandise purchased by their customers. The customers, once having pasted the trading stamps in "savers books", may present filled books of stamps to Gold Bond at one of its affiliated "redemption centers" where the books can be exchanged for either cash or gift merchandise.

The reason for the establishment of the Georgia subsidiary was that in 1960 the parent company acquired, as a principal account, Colonial Stores, Inc. (hereinafter referred to as "Colonial"), a large chain of retail food stores operating in the southeastern region of the United States, which, by virtue of a formal agreement signed in February of that year, contracted to become a licensee of the Gold Bond stamp program.

Bradfute, as previously mentioned, is a company which devises and operates promotional contests and games to effect increased volume of sales in retail stores by providing additional incentive for customer purchases. Inasmuch as Bradfute intended to present a fall promotion program to Colonial, it communicated with Warren Carlson, vice-president and southeastern regional manager of Gold Bond, to inquire whether Gold Bond, having recently acquired Colonial as a customer account, would be interested in participating in the promotion. Since the proposed program was to be presented to Colonial on June 2, 1961, it was agreed between Howard Bradfute, president of the Bradfute Corporation, R. W. Ballard, manager of the Atlanta division of Gold Bond, and Warren Carlson, that they would meet together on the day preceding the presentation to determine the extent of Gold Bond's interest, if any, in assuming an active role in the promotion.

At the meeting, Howard Bradfute described the program as a bingo game (referred to as the "Sandy Saver" game) requiring the supermarket to distribute game cards to its customers. Following the distribution, a list of winning numbers furnished by Bradfute would be published in the local newspapers against which the customers would attempt to match the numbers on their cards. A customer successfully matching all the numbers constituting a complete row on his card would be a winner, thereby entitling him or her, as the case might be, to a prize, the nature of which would depend on the particular row which had been completed. Supposedly, if the game were a success, all parties to the promotion would profit therefrom. Bradfute, of course, would be paid for operating the game, Colonial would profit from the increase in retail sales, and Gold Bond would profit by an increased demand for trading stamps.

Inasmuch as Gold Bond's suggested role in the overall program consisted solely of furnishing the prizes or, in this instance, books of trading stamps, the net profit which Gold Bond could reasonably anticipate from its participation directly depended upon the number of prizes which it would be required to furnish. With regard to this principal considera-

tion, Bradfute assured Gold Bond that the game was controlled by a mathematical formula which gave them complete control over the number of winners which the game would produce. Accordingly, Bradfute represented that Gold Bond would be required to supply, as prizes, only 3 books of stamps for every 1,000 game cards purchased by Colonial and distributed to the customers. Additionally, as a further inducement, Bradfute agreed to pay to Gold Bond the sum of $2.00 for every 1,000 cards sold.

On the following day, June 2, 1961, Howard Bradfute, Warren Carlson and R. W. Ballard met with Charles Johnson, the general business manager for all divisions of Colonial, at which time Johnson was informed that an agreement had been reached between Bradfute and Gold Bond to the effect that Gold Bond would supply the prizes in the event that Colonial decided to entertain the operation of the Sandy Saver game in its retail outlets.

Subsequently, in July 1961, it was mutually accepted as between Bradfute and Colonial that the Sandy Saver game would be run in the supermarkets for an 8-week period and, on August 17, 1961, a contract was entered into reciting the terms of the agreement. Immediately thereafter, a prize breakdown sheet dated August 21, 1961 was sent by Howard Bradfute to Gold Bond (Plaintiff's Exh. 4) indicating specifically how many prizes in each of the various prize categories would be required during each week of the contest. The sheet recited numerical totals reflecting the fact that there would be 2,101 prizes comprising 7,203 books of Gold Bond stamps. Further, as regards the processing of winning game cards, it was established that Bradfute would verify the winning cards and thereafter compose a list of the game winners which would be updated on a daily basis. This list would be periodically sent to Gold Bond, which, in turn, would issue the gift certificates accompanied by congratulatory letters.

On October 2, 1961, the game was introduced to the public in the Atlanta stores. On the following day, Warren Carlson received a telephone call from R. W. Ballard, who informed him that on that same day, three or four 100-book winners had been reported in one of the Colonial stores. This development was cause for concern in that, according to the prize breakdown sheet submitted to Gold Bond, there had been no 100-book winners expected during the first week of the contest.

Thereafter, a meeting was called on October 4, 1961, at which Howard Bradfute reported that because of the erroneous inclusion of certain numbers in some of the game cards, there would be approximately fifty 100-book winners over and above the figure which had been initially established by the game formula. Following the discovery of this error, Colonial, with the knowledge of Gold Bond, attempted to minimize the number of extra winners by agreeing to a change in the newspaper ads so that the number "41" would be substituted for the number "44". Colonial, also with Gold Bond's knowledge, instructed its store managers and sales personnel to delete from the undistributed game cards a certain card which Bradfute had determined contained the error resulting in the alleged 100-book winners. Subsequently, however, it was discovered that other errors had been made resulting in an excess of 2-book winners and, eventually, 200-book winners.

A brief glance at the process by which Bradfute produced the Sandy Saver game cards indicates that the first step was to make a "board" or "mechanical" consisting of a piece of cardboard on which there were affixed bingo-styled squares. Each square resembled a grid with 25 playing numbers arranged in accordance with Bradfute's mathematical formula. The boards were keyed with symbols indicating certain instructions which the printer would follow upon receiving the boards for processing.

Specifically, the key told the printer the position in which each particular board was to be placed on the ultimate plate, such plate normally containing 15 boards. The boards were further marked with other distinguishing symbols so that the winning boards could be identified from the non-winners.

The printer would deliver the boards to the platemaker-engraver who would in turn photograph them, thereby producing negatives from which positive films were made. The platemaker would then take the positive films of the respective boards and place them, one by one, in accordance with the key symbols, over a plate which is then exposed through each of the 15 film positives. This resulted in a full-size press plate containing the reproduction of the 15 boards for a total of 180 bingo squares. The boards would eventually be returned to Bradfute together with a blueprint taken of the press plate which Bradfute would check for accuracy. The plate would then be used to print the job.

The films of boards used in previous games had been retained by the platemaker and were used for the Sandy Saver promotion. It should be noted that these films showed numbers and grids only, without any editorial material or artwork. The editorial copy and artwork, supplied by Bradfute, was added by means of a separate film which, when superimposed on the plate and then exposed, resulted in the total composition of grids, numbers, ornamental artwork and the printed legends as well.

The difficulty in the Sandy Saver production order arose by reason of a decision to make the playing cards oblong (horizontal) rather than upright (vertical). When these instructions were received by the printer, he passed them on, together with the films, to the platemaker. The platemaker, in order to effect the transformation, was required to cut all the playing numbers from the individual films. This procedure implemented by the use of a scissor, had to be accomplished with each of the 180 bingo squares that would ultimately appear on the new plate. In the process, the squares became separated from the key symbols which had been located on the margin of the film. Due to some inadvertent shuffling by the workmen in the plant, certain of the winning boards became mixed in with the non-winners and were subsequently etched onto the non-winning plate. In other words, the non-winning plate contained the impression of certain winning boards.

The final stage of the production process was to cut piles of press sheets into 30 blocks of 6 cards each, collate or intersperse winning cards with non-winners and cut the resulting 6-block into individual cards.

Although it was the practice of Bradfute to check the game cards after they came off the press sheet and before they were sent to the bindery, and in spite of the fact that such practice was followed in this case, the winning cards which had slipped their way into the losing group remained undetected prior to their distribution in the stores.

## DISCUSSION

It is plaintiff Gold Bond's contention that on June 1, 1961, it entered into a legally enforceable oral contract with Bradfute in which it obligated itself to furnish all the prizes for the Sandy Saver promotional game. Plaintiff alleges, however, that a built-in warranty existed which set an upper limitation on the number of prizes that would be required for the successful operation of the contest. Gold Bond asserts that the warranty consisted of a material representation by Bradfute that the game was predetermined according to a mathematical formula which guaranteed that no more than 2,101 prizes comprising a total of 7,203 books of Gold Bond stamps would be needed. Plaintiff contends that because of the errors which resulted from the accidental intermingling of winning cards with losing ones, it found itself in a position of having to furnish an additional 40,212 books of stamps at a cost of $3.-

00 per book, thereby suffering damages in the sum of $120,636.00.[1]

Looking at the factual context surrounding the agreement between Bradfute and Gold Bond, it is apparent to this Court that a valid oral agreement existed between the two as of June 1, 1961. Prior to that date, Bradfute became anxious to operate its game in the Colonial stores. Knowing that Colonial had recently entered into an arrangement with Gold Bond for the use of its stamp program, Bradfute sought Gold Bond's participation in an effort to influence Colonial's acceptance of the idea. Additionally, it appears that Bradfute was informed, in its previous meetings with Charles Johnson of Colonial, that if any game were to be sponsored, Colonial required that the prizes be books of trading stamps. Obviously, therefore, if Bradfute wanted the Colonial contract, it was essential that it convince Gold Bond to supply the necessary prizes. To this end, Howard Bradfute, representing the defendant, and Warren Carlson and R. W. Ballard, representing plaintiff, met on June 1, 1961 at the Hilton Inn in Atlanta, Georgia. At the meeting, Howard Bradfute, exhibiting circulars and other promotional materials, described the proposed game in detail to the representatives of Gold Bond in the same manner as it would be presented to the representatives of Colonial on the following day. Naturally, Bradfute emphasized the obvious beneficial effect which a sales stimulation program could have on the volume of trading stamps distributed to the shoppers. Inasmuch as Colonial desired that the prizes be in the form of trading stamps, Bradfute inquired into the extent of Gold Bond's interest in assuming a participative role. Since the profitability of Gold Bond's participation in the game program directly depended upon the number of prizes required, it is reasonable to assume that Gold Bond's consent to enter into the agreement emanated from its reliance on the material representation made by Bradfute regarding its control over the number of expected winners.

A proposal letter from Howard Bradfute, dated June 1, 1961 and addressed to Warren Carlson, expressed the aspects of the game as described at the June 1 meeting and offered Gold Bond a participating interest therein. The letter begins:

"Dear Mr. Carlson:

The program we offer Gold Bond is quite simple."

and continues to list the advantages which, in Bradfute's estimation, the program would bring to Gold Bond. (Plaintiff's Exh. 2.) The letter was accompanied by a "Lucky 11 Game" Manual,[2] which, in addition to generally describing the operation of the game, recited that it guaranteed the mathematical formula as a control over the distribution of prizes. (Plaintiff's Exh. 1 at 6.)

On the following day, June 2, 1961, representatives of Gold Bond attended the scheduled meeting between Bradfute and Colonial. It was at that time, on the basis of Bradfute's previous representations, that Gold Bond informed Colonial that it would supply all the prizes for the proposed game.

Further evidence of the importance which Bradfute placed on its mathematical formula and of plaintiff's right to rely thereon can be found in the prize breakdown sheets which Bradfute furnished to Gold Bond. The sheet dated July 21, 1961 recited the number of prizes which would be required in each of the various prize categories and

---

1. With regard to that part of the oral agreement requiring Bradfute to pay plaintiff $2.00 per 1,000 game cards sold by defendant to Colonial, the parties herein agree that plaintiff is entitled to $4,800.00 of which $2,401.92 has been previously tendered. (Pre-Trial Order of March 21, 1968, Agreed Findings of Fact, Item 31).

2. "Lucky 11" was an identical game used for a different sales promotion.

showed a tally of the number of trading stamp books which the prizes represented. (Plaintiff's Exh. 3.) The figures were given as follows:

| Number of Prizes | Prizes | Total Number of Books |
|---|---|---|
| 9 | 200-Books | 1,800 |
| 7 | 100-Books | 700 |
| 8 | 50-Books | 400 |
| 10 | 25-Books | 250 |
| 11 | 20-Books | 220 |
| 21 | 15-Books | 315 |
| 25 | 10-Books | 250 |
| 70 | 5 Books | 350 |
| 245 | 3-Books | 735 |
| 488 | 2-Books | 976 |
| 1,207 | 1-Book | 1,207 |
| 2,101 | | 7,203 |

More dramatically, a sheet submitted to Gold Bond, dated August 21, 1961, set forth the prize breakdown for each of the 8 weeks that the game was scheduled to play. (Plaintiff's Exh. 4.)

Under Georgia law,[3] inasmuch as the oral agreement was one "to be performed within one year from the making thereof", Ga.Code Ann. § 20–401(5), no formal writing is requisite to the validity of the contract. In this instance, the duration of the contest was to be 8 weeks. Although it is reasonable to expect that prizes may still have had to be furnished after the formal closing of the game, a realistic construction of the duration of this contract compels a determination that the 1-year statute of frauds limitation is inapplicable herein.

The central issue of this controversy, however, and I might add, one not without its difficulties, is whether Gold Bond is a proper plaintiff in this action, that is, a party which has suffered certain damages as the direct result of a breach of contract by the defendant, or whether plaintiff stands before this Court solely because of injuries sustained by virtue of its own gratuitous conduct bearing no relation to any contractual demands. This, of course, cannot be resolved without first determining from the evidence the extent of plaintiff's legal obligation under its oral agreement with Bradfute.

Plaintiff's position in this regard is a simple one. It claims that its agreement with Bradfute was one to supply *all* the prizes required for the game's entire operation, which agreement was induced by the express representation by Bradfute that there would be an upper limitation of 2,101 prizes requiring 7,203 books of trading stamps. When the negligent intermingling of winning and non-winning boards occurred resulting in the unanticipated need for an extra 40,212 stamp books, defendant breached its warranty for which it should be liable in damages.

Defendant, on the other hand, views plaintiff's obligation under the oral agreement as a much more limited one. According to its interpretation, the injury which the plaintiff allegedly suffered was, if anything, self-inflicted in that the prize schedule furnished by Bradfute to the plaintiff herein, it is argued, represented the outer limits of plaintiff's legal obligations. More spe-

3. Inasmuch as the contract was both entered into and performed in the State of Georgia, the parties are correct in stipulating the applicability of Georgia law to the substantive issues herein.

cifically, it is defendant's contention that Gold Bond agreed to supply 7,203 books of trading stamps and nothing more. Defendant concludes therefrom that Gold Bond's distribution of the 40,212 books of stamps (the value of which constitutes the claimed damages in dispute in this case) above and beyond the 7,203 books specifically called for by the contract did not represent a legitimate attempt to fulfill legally enforceable obligations but rather was a gratuitous gesture, at the behest of Colonial, to prevent the good will attached to the Colonial name from being impaired, as well as to insure that their own conduct under the circumstances would in no way jeopardize their relationship with Colonial, Gold Bond's *raison d'etre* in the State of Georgia. Of course, under this narrow construction of the agreement, plaintiff's claim, representing an injury suffered solely because of Gold Bond's practical business decision to please its major account, would be the product of plaintiff's compounding the damages rather than mitigating them, contrary to the fundamental principles of contract law.

■ After a consideration of all the circumstances surrounding the transactions in this case, it is the opinion of this Court that the weight of the evidence reflects that Gold Bond entered into a valid oral contract to supply all the prizes for the game but placed total reliance, and justifiably so, on Bradfute's oral and written representations that no more than 7,203 books of trading stamps would be needed, the limitations contained therein bearing directly on the profitability of Gold Bond's participation in the program.

■ Inasmuch as the terms of an oral agreement are not neatly embodied within the four corners of an instrument, interpretation of such a contract requires that the court search out the meaning that each party thereto intended to convey by considering the words expressed, either orally or by written correspondence, and the action taken in the context of the relevant circumstances. 3 Corbin, Contracts § 538 (1960).

Defendant argues, and not wholly without merit, that certain facts appear to indicate that plaintiff's responsibility terminated when it furnished the total number of prizes accounted for on the prize sheets. The fact that Gold Bond failed to appear at the important meetings of October 4 and October 12 following the discovery of the extra 100-book winners, the fact that once the errors were discovered, it was Colonial which appeared to play the principal role in the negotiations regarding remedial procedures, and, most convincing, the fact that the written contract between Bradfute and Colonial referred only to the specific number of prizes listed on the schedule, that is:

"3. For the initial game, 2101 prizes, amounting to 7203 filled books of Gold Bond Trading Stamps will be offered." (Plaintiff's Exh. 3.)

certainly do lend credence to defendant's position on this issue. However, the evidence which is most influential to this Court's conclusion consists of an exchange of letters between Howard Bradfute and Warren Carlson concerning the arrangement of a financial settlement as a result of the overage of 100-book winners. The first letter of the exchange, dated October 18, 1961, recited (Plaintiff's Exh. 7):

"Dear Warren:

Enclosed please find our check, No. 3886, for $2,401.92. This check represents one-half of the amount due you on the Sandy Saver Game in Atlanta.

In addition to the above check you will also find our check for $4,284.00. *This will reimburse you for additional two book winners over and above the 30 we should have had in week No. 1,* or 952 X 2 = 1,904 books at $2.25.

Sincerely yours,
Howard Bradfute"

(Emphasis supplied.)

On October 23, 1961, Warren Carlson replied (Plaintiff's Exh. 9):

"Dear Howard:

*I have your letter of October 18 enclosing your check for $4,284 reim-*

*bursing us for additional two-book winners over and above the thirty there should have been in week No. 1.* I am somewhat at a loss to understand your use of $2.25 per book, since our agreement originally was $3.00. I realize that in discussing the possible settlement in connection with the overage of 100 book winners I indicated that we would be willing to assist by lowering our price to $2.25. However, this offer was limited to that situation and was only applicable in the event of a settlement and thus far all of our good efforts to dispose of the matter have gone for naught. At this time, therefore, we are merely holding your check for $4,284 and will expect to hear from you further concerning it.

> Yours very truly,
> Warren S. Carlson"

(Emphasis supplied.)

It is clear that to accept defendant's argument would require this Court to ignore the written expressions of the parties themselves to the agreement in question. The concept of reimbursement simply would not enter the picture if Gold Bond were not obligated to furnish prizes above and beyond the specific amount stated in the schedule. It is my opinion that if the parties had intended the specific limitation to be an absolute outer boundary and subsequently there arose a need to supply an unanticipated amount of extra prizes, the correspondence between Bradfute and Gold Bond relating to the matter would have been couched in terms of "a further purchase of prizes" or an "additional order" rather than "reimbursement" for the extra books which Gold Bond furnished as a result of the error.

I should point out at this time that most weight is given to the above exchange of letters not only because it represents written expression directly reflecting the intendment of both parties to the agreement but also because the factors which I previously mentioned as sup-

port for defendant's contention are ambiguous to the extent that they could be used to bolster plaintiff's position as well. It could be argued that the reason for plaintiff's absence at the October meetings and its minimal participation in the negotiations concerning remedial procedures was its clear recognition that it was unquestionably obligated to furnish all the prizes and that a proper determination of the number of extra prizes necessary for distribution would grow out of a settlement between the two parties to the basic agreement, that is, the company responsible for the operation of the game and upon which liability ultimately rested, and the supermarket chain sponsoring the game, the reputation or good will of which stood to be most seriously impaired. Additionally, it could be reasonably assumed that Gold Bond, confident of being reimbursed for any prizes supplied which were additional to the specific number recited in the schedule, simply saw no reason to participate in the negotiations.

Concluding, therefore, that Gold Bond is a proper party plaintiff to this action, having suffered damages as a result of defendant's breach of warranty, I shall now proceed to consider defendant's other contentions.

■ Briefly, with reference to defendant's argument that inasmuch as the errors were typographical in nature, it was thereby absolved from liability,[4] it is the position of this Court that even assuming, *arguendo*, that the errors in this case were in fact typographical ones, it is evident that defendant's right to correct such typographical errors does not embody a concurrent right to be absolved of responsibility for any damages incurred by others as a result of defendant's own negligence in the operation of its sales stimulation programs. In the instant case, plaintiff did allow defendant to correct the errors which it had made by permitting them to change certain of the game numbers which had already

---

4. The game cards specifically stated:
    "We [defendant herein] reserve the right to correct any typographical errors * * *." (Plaintiff's Exh. 20.)

been published in the newspapers as well as assisting them in pulling the defective cards from those which had been distributed to the various Colonial stores. However, it would require a broad stretch of the imagination to infer from this right which defendant reserved to itself that the retail outlets with which it contracted concurrently relinquished their rights to recover damages for expenses incurred as a result of defendant's negligence in allowing faulty game cards to enter the stream of public distribution.

Next, it is defendant's contention that the Sandy Saver sales promotion plan was an illegal lottery under Georgia law, thereby barring plaintiff from enforcement of its contract which agreement is tainted by association. A brief consideration of the setting in which this oral agreement arose reveals that Bradfute, at the time when it was soliciting Gold Bond's participation in the venture, represented that the company investigated the legality of all of its contests prior to their operation. Specifically, the "Lucky 11 Game" manual, which was shown to Gold Bond prior to its entering into the agreement, and after which game Sandy Saver was fashioned, expressly stated (Plaintiff's Exh. 1 at 6):

> "*FULL LEGAL PROTECTION* is guaranteed by contract. Thoroughly checked for legality in your area before we start."

In spite of this representation, upon which Gold Bond had a right to rely, Howard Bradfute testified at trial that with regard to the Sandy Saver promotion, his company in fact had not run an independent check on the legality of the game but relied solely on the fact that Fred L. Bradfute, retired president of the defendant corporation, had sometime previous thereto conferred with Ernest P. Rogers, counsel for Colonial, concerning the legality of running game programs in the State of Georgia. Howard Bradfute testified that although he knew that the discussions between his father, Fred Bradfute, and Ernest Rogers had taken place, he did not know the results of such conversations, and,

moreover, at the time that the Sandy Saver game was operating in the Colonial stores, had no actual knowledge as to the legal status of that promotion.

It is the view of this Court that the agreement between Bradfute and Gold Bond was simply one to provide prizes, which, in and of itself, was a separate contract sufficiently peripheral to and independent of the contract between Bradfute and Colonial concerning the actual operation of the game so that, standing alone, it is deserving of enforcement in a court of law. As expressed in 6A Corbin, Contracts § 1519:

> "* * * Just how serious the crime or immorality must be in order that the seller's mere knowledge will prevent his enforcement of the bargain is a matter of degree, such as to make it undesirable to attempt to draw an exact line. A frequently reoccurring case is one in which a sale of intoxicating liquor is made in a state where the sale is lawful, the seller knowing that the buyer intends to make resales in a state where they are unlawful. The seller can maintain action for the price. *The same result obtains where one sells a piano with knowledge that the buyer intends to use it as a prize in a lottery*, or where one lends money knowing that the borrower intends to buy a lottery ticket or to bet on an election." (Emphasis supplied.)

In the present case, plaintiff comes before this Court with even cleaner hands, in that it was totally unaware at the time of the Sandy Saver promotion that the game was illegal, see Ralston v. Boady, 20 Ga. 449 (S.Ct.1856), having relied on defendant's representation that a legal check had been made.

Even assuming, *arguendo*, that the contract between Bradfute and Gold Bond were an illegal one, it is apparent that defendant, clothed in robes of commercial deceit, is presently attempting to employ the defense of illegality in a situation where, but for its own false representations, plaintiff, it appears,

would not have entered into the agreement.

■ Although a court will not come to the aid of any party to an illegal contract where the party seeking the court's assistance is found to be *in pari delicto* with the others, it appears that the negligible amount of law which exists on the subject in the State of Georgia permits a court to restore to a just position an innocent party induced into an illegal contract by the false representations of the other party thereto. Cobb v. Daughtry, 188 Ga. 70, 2 S.E.2d 638 (S.Ct. 1939). The underlying gist of this proposition, of course, is that judicial abstention from enforcement of an otherwise valid contract works an injustice where only one of the parties to the agreement had knowledge or reason to know of the illegality thereof. As stated in Wolk v. Benefit Ass'n of Ry. Employees, 172 F. Supp. 62, 63 (W.D.Pa.1959):

"It is true that, generally, a court will not lend its aid to the enforcement of an illegal contract but will leave the wrongdoers where it finds them. [Citation omitted] * * *. Nevertheless, where the illegality of the bargain is due to facts of which one party is justifiably ignorant and the other party is not, the illegality does not preclude recovery by the ignorant party of compensation for any performance rendered while he is still justifiably ignorant * * *." See Restatement of Contracts § 599 (1932).

■ Accordingly, although I do not find the contract between Bradfute and Gold Bond to be an illegal one, even assuming that it were it is the opinion of this Court that plaintiff, ignorant of such illegality and justifiably relying on the express representation of Bradfute that the legality of every game is in-investigated by its staff prior to the commencement thereof, could not be barred by the defense raised herein.[5]

■ I now come to the issue of damages. Since it appears to be the practice of Gold Bond to destroy, after a period of one year, invoice sheets relating to the prices paid for the merchandise distributed to the prize winners upon redemption of their gift certificates, the "best evidence" which this Court has before it for the purpose of determining the number of stamp books which Gold Bond issued as prizes during the period commencing October 1961 through December 1962 consists of general ledger sheets prepared by plaintiff in the ordinary course of its business and certain invoices submitted to plaintiff by its non-profit purchasing affiliate indicating the total number of books which had been redeemed during the above-stated period of time. This evidence I find to be probative and sufficient as a basis for a proper determination of the issue.

Inasmuch as the General Ledger sheets (Plaintiff's Exhs. 32, 33) represent ledgers covering only the expenses relating to the merchandise selected by the game winners, by dividing this total cost figure by the unit cost (or cost per book) of merchandise, the quotient should represent the number of trading stamp books issued as prizes during the relevant period.

The ledger for 1961 (Plaintiff's Exh. 32) shows that the cost to plaintiff of merchandise selected by the game winners amounted to $69,664.79. This figure, when added to the total cost figure shown on the 1962 General Ledger (Plaintiff's Exh. 33), that is, $22,240.79, yields a total cost of $91,905.58. The testimony of John J. Hunt, employed in 1961 as secretary and comptroller of the Gold Bond Stamp Company, evidenced that the price per book which Gold Bond had to pay to the Premium Corporation of America (hereinafter referred to as "PCA") for every book which PCA redeemed amounted to $2.01 in 1961 and

---

5. Defendant failed to offer any proof at trial in support of its contention that plaintiff's mere issuance of trading stamps violated Sections 26–6501 and 26–6506 of the Georgia Code. Accordingly, that allegation shall not be considered herein.

$2.04 in 1962.[6] Therefore, inasmuch as PCA is a non-profit corporation, it follows that by dividing the figure representing the total cost to PCA of merchandise supplied by it to the game winners, that is $91,905.58, by the "book price" or approximately an average of $2.03 which PCA charged to Gold Bond for every book of stamps which it redeemed so as to cover its own total cost, this Court arrives at the figure of 45,273 books of stamps redeemed for prizes. Adding to this total a reasonable amount for books redeemed after December 1962, the figure set forth by plaintiff of 47,-415 books appears realistic and one acceptable to this Court. Therefore, subtracting from this amount the 7,203 books of stamps which was guaranteed by Bradfute to represent the outer limit of plaintiff's obligation under the agreement, it appears that because of the errors made in the production of the game cards, Gold Bond was required to furnish an extra 40,212 books of trading stamps. Further, since the testimony of John J. Hunt indicates that the plaintiff's cost of doing business, which includes the cost of redemption, was approximately $3.00 per book of stamps, plaintiff's damages total $125,463.00 of which $120,636.00 represents the cost of the additional 40,212 books, and $4,800.00 represents the amount due plaintiff pursuant to its agreement with Bradfute and is so stipulated in Agreed Partial Statement of Facts, No. 31, as set forth in the Pre-Trial Order.[7]

The foregoing represents this Court's findings of fact and conclusions of law.

A judgment shall be entered for the plaintiff in conformity herewith.

6. The Gold Bond Stamp Company of Georgia, just as in the case of every Gold Bond subsidiary, was charged a "book price" by PCA, a separate non-profit corporation organized for the purpose of serving the Gold Bond subsidiaries by buying, warehousing and distributing the merchandise needed for the redemption process, selecting merchandise for the Gold Bond catalogue and generally supervising the operations of the redemption centers. Inasmuch as PCA would take up the books of stamps in exchange for merchandise, it would naturally look to Gold Bond for payment of a certain sum of money for every stamp book which it accepted for redemption.

7. Inasmuch as both plaintiff and Colonial permitted Bradfute to change certain of the playing numbers and assisted in the removal of approximately 2,300 game cards from the various Colonial stores, it can hardly be said, in the opinion of this Court, that either plaintiff or Colonial prevented a mitigation of the damages. The fact that Colonial refused to allow Bradfute the opportunity to participate in settlement meetings with all of the extra winners is solely evidence of its grave concern that the good will which it had established with its customers would not be jeopardized by a game which could conceivably smack of fraud to those persons unaware of the problems which arose in the game's operation and, possibly, even to those people subsequently informed of the errors.

If, however, it is defendant's position that Colonial somehow interfered with the mitigation process, it can always institute separate proceedings against Colonial to recover damages for injury suffered as a result thereof since it has already vouched Colonial in.