[No. 37831. Department Two. December 23, 1965.]

SHERWOOD & ROBERTS—YAKIMA, INC., *Appellant,* v. CLYDE G. LEACH *et al., Respondents.**

*Reported in 409 P.2d 160.

*Lauren W. Dobbs* and *Gavin, Robinson, Kendrick, Redman & Mays,* for appellant.

*Harry Hazel,* for respondents.

*The Attorney General* and *Donald L. Navoni, Assistant,* amicus curiae.

LANGENBACH, J.†—Sherwood & Roberts—Yakima, Inc., (appellant), as assignee, sued Mr. and Mrs. Leach (respondents) for the unpaid purchase price of certain equipment sold on a conditional sale contract.

Lifetone Electronics, Inc. (hereinafter referred to as Lifetone), a corporation, sold radio intercoms and fire alarm systems in the Yakima area. In so doing, Lifetone represented itself to be connected with the advertising division of the General Electric Corporation. As part of an advertising promotion scheme, consumers, as the respondents, were to get the equipment for nothing under the following circumstances.

---

†Judge Langenbach is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

The consumer would purchase a radio intercom and fire alarm system on a conditional sale contract. As part of the transaction, a representative's commission agreement would be executed. By this, the consumer would furnish Lifetone a list of prospective purchasers. For each sale to any one so referred, the consumer would receive a commission of $100. A bonus guarantee would also be executed. By this if Lifetone made sales presentations to 15 of a consumer's referrals without a sale being made, the consumer would receive $200. The Lifetone salesman would assure the consumer that the commissions would be at least adequate to cover his purchase price.

On September 30, 1963, respondents, with the thought of getting the equipment for nothing purchased a fire alarm system and a radio intercom on a conditional sale contract. At this time Mr. Leach gave the Lifetone salesman approximately 60 names. Respondents have never received a commission.

Respondents were to mail to the referrals a form letter which said that a "friend" would call about a "fabulous program." If the referrals questioned respondents, respondents' answers were to be taken from an instruction card. The card emphasized the money-making program, and instructed respondents not to talk about the product. In all cases, the salesman discouraged purchasers, like respondents, from contacting the people they referred until the salesman had a chance to contact such referrals first.

Respondents and Lifetone agreed to request financing for the conditional sale contract from appellant. After the conditional sale contract had been executed, it was offered to appellant for financing. This was the first knowledge appellant had of this particular transaction. Appellant, however, was fully aware of the general operation of Lifetone, and had months previously assured Lifetone that it would purchase such contracts. At the time appellant purchased the contract, respondents agreed with appellant to pay the amount of the sale contract plus carrying charges, regardless of any commissions paid under the commission agreements. Respondents are obligated to pay $1,187.28 (this includes

taxes and finance charges), of which $898 is the contract price of the equipment. The cost of the equipment is $225.32.

The number of sales made by Lifetone in the Yakima area was 137, totalling $129,947.04. The commissions paid to purchasers for referrals were $14,900. These sales transactions occurred between May 21st and October 22, 1963.

The trial court granted respondents' motion for summary judgment upon the depositions and affidavits submitted on the ground that the representative's commission agreement was illegal; it was a lottery under RCW 9.59.010; and the conditional sale contract, being an integral part of the same transaction, was tainted with such illegality, hence, unenforceable.

Appellant argues that (1) the referral agreement is not a lottery, and (2) if it is a lottery, appellant is entitled to maintain the action because it is not in pari delicto, or it can establish its case without relying on the illegal transaction. These arguments will be considered in their respective order.

■ Const. art. 2, § 24, provides: "The legislature shall never authorize any lottery . . . ." This provision "[P]rohibits *any* lottery. . . . [T]he word 'any,' given its usual meaning, is all embracing as far as different types and kinds of lottery schemes and devices are concerned. Clearly, its meaning seems to us to be the equivalent of the terms *all* or *every*." *State ex rel. Evans v. Brotherhood of Friends,* 41 Wn.2d 133, 145, 247 P.2d 787 (1952).

A lottery is defined in RCW 9.59.010 as follows:

A lottery is a scheme for the distribution of money or property by chance, among persons who have paid or agreed to pay a valuable consideration for the chance, whether it shall be called a lottery, raffle, gift enterprise, or by any other name, and is hereby declared unlawful and a public nuisance.

■ Appellant argues that since the purpose of the referral agreement is to provide Lifetone with prospective purchasers, the agreement is not a lottery. This is not so. If all the elements of a lottery are factually present, it is a lottery. The essential elements as set forth in RCW 9.59.010

are "(1) the distribution of money or property [prize], (2) chance, and (3) a valuable consideration paid or agreed to be paid for the chance." *State v. Danz*, 140 Wash. 546, 547, 250 Pac. 37 (1926).

Appellant contends that the first and third elements are not present because RCW 9.59.010 contemplates a scheme "among persons" (plural) who have agreed to pay a consideration for the chance of obtaining money, and here only respondents can obtain a commission. This argument was answered by the court in *State ex rel. Evans v. Brotherhood of Friends, supra.* In that case, the court, in holding slot machines to be a lottery, said, at 151:

> Obviously, a single machine is so constructed that it is normally operated by one individual at a time. But each machine is a part of the over-all operation of the other machines . . . . One player's loss constitutes a definite contribution to the general funds of the club; another player's winnings . . . constitute a distribution from the . . . general funds. Thus, each machine is tied in with the operations of all other machines.

Here, as part of a general operation, respondents may obtain commissions (prize) and they have agreed to pay the purchase price of the equipment (consideration) in an effort to get that prize. The next question is whether that effort is based on chance.

In *State v. Lipkin*, 169 N.C. 265, 271, 84 S.E. 340 (1915), it was said:

> The Court will inquire, not into the name, but into the game, however skillfully disguised, in order to ascertain if it is prohibited, or if it has the element of chance. It is the one playing at the game who is influenced by the hope enticingly held out, which is often false or disappointing, that he will, perhaps and by good luck, get something for nothing, or a great deal for a very little outlay. This is the lure that draws the credulous and unsuspecting into the deceptive scheme, and it is what the law denounces as wrong and demoralizing.

Chance within the lottery statute is one which dominates over skill or judgment. The measure is a qualitative

one; that is, the chance must be an integral part which influences the result. The measure is not the quantitative proportion of skill and chance in viewing the scheme as a whole. *State ex inf. McKittrick v. Globe-Democrat Publishing Co.*, 341 Mo. 862, 110 S.W.2d 705 113 A.L.R. 1104 (1937).[1]

■ Appellant argues that skill or judgment is factually the dominant factor, *i.e.,* the factors determining whether a commission will be paid are the judgment of respondents used in selecting names they refer and the skill of the Lifetone salesman. But we are only concerned with the skill or judgment of respondents; the skill of the Lifetone salesman is irrelevant. Assuming that respondents in fact used skill or judgment in selecting the referrals, the trial court properly held that chance permeates the entire scheme. The court found that respondents took a chance that the referrals might not be interested; that the salesman might not adequately make his presentation; that the referral might have already been referred by someone else; that the market might be saturated; and that the salesman might not even contact the referral. In addition, the trial court noted that respondents have no control over the general operation after they gave the names of referrals. In fact, respondents were told not to contact the referrals before the Lifetone salesman made his presentation, and respondents were told to emphasize the money-making program in case the referrals contacted them. Appellant argues that the want of control is not a legitimate factor to consider. This argument is tenuous.

The lack of control feature in referral selling is much broader than that designated by the trial court. It is inherent in referral selling that purchasers such as respondents be without control. Sooner or later, the market, unknowingly to the purchasers, will become saturated. This

---

[1]See, *State ex rel. Evans v. Brotherhood of Friends,* 41 Wn.2d 133, 247 P.2d 787 (1952), where this court relied on *State v. Coats,* 158 Ore. 122, 74 P.2d 1102 (1938), in using the words "substantial degree of skill or judgment" to denote the same concept. In the *Coats* case, the court said, at 130: "No judgment or skill which the player may exercise has any appreciable effect upon the result."

principle is the same as in the chain letter scheme. The case at hand is a classic example.

The Lifetone salesman told respondents that they could get something for nothing through the referral selling scheme. Respondents are obligated to pay $1,187.28 for equipment costing $225.32. For ease of demonstration, respondents must earn 12 commissions of $100 each in order to get, as promised, something for nothing. This means that 12 of respondents' referrals must purchase as respondents did; they, in turn, to get something for nothing, must find 12 more people to purchase, and so forth, as follows:

|  | Number of Purchasers |
|---|---|
|  | 1 |
| 1st round | 12 |
| 2d round | 144 |
| 3d round | 1,728 |
| 4th round | 20,736 |
| 5th round | 248,832 |

Soon the scheme will run itself out; the market will become saturated. Here, Lifetone made its first sale in May, 1963, and its last sale in October, 1963. The respondents entered the picture in September. They gave the Lifetone salesman approximately 60 names at that time, and they never received a commission. In fact, only $14,900 in commissions were paid in the Yakima area, while the total number of sales was 137, totalling $129,947.04 (without finance charges).[2]

Respondents took a chance on whether they could get something for nothing. This chance permeates the entire scheme of referral selling. This court holds that the referral selling scheme is a lottery.

Since the referral selling agreement is contrary to the terms and policy of RCW 9.59.010, it is illegal and unenforceable (*Waring v. Lobdell*, 63 Wn.2d 532, 387 P.2d 979 (1964); *Sinnar v. LeRoy*, 44 Wn.2d 728, 270 P.2d 800 (1954);

---

[2] 1 person received $1,200; 1 person received $900; 1 person received $800; 2 persons received $600; 1 person received $500; 3 persons received $400; 10 persons received $300; 15 persons received $200; 31 persons received $100; and 72 persons received nothing.

and *Hederman v. George*, 35 Wn.2d 357, 212 P.2d 841. (1949)); and when an instrument is intimately connected with an illegal one, the former becomes tainted with that illegality and is likewise unenforceable. *Miller v. Myers*, 158 Wash. 643, 291 Pac. 1115 (1930); and *cf., Van Horn v. Kittitas Cy.*, 112 Fed. 1 (W.D.Wash. 1901).

Here, the referral agreement and the conditional sale contract were all part of one transaction. The Lifetone salesman represented to respondents that the conditional sale contract obligation would easily be paid from "commissions earned" from the referral selling agreement, and Mr. Leach so intended to pay the conditional sale contract. It is clear respondents would have a good defense against Lifetone. It also appears that they have a good defense against appellant. The appellant, as assignee of a conditional sale contract, takes the contract subject to all defenses. See, RCW 4.08.080; and *Doub v. Rawson*, 142 Wash. 190, 252 Pac. 920 (1927).

Appellant, however, argues that it is entitled to maintain this action on either of two grounds: (1) it was not in pari delicto with respondents, or (2) it can establish its case without relying on an illegal transaction.

A person who is not in pari delicto can maintain an action based on an illegal contract. *Miller v. Myers, supra.* Appellant bases its argument on the facts that it was not a party to the transaction; it did not have knowledge of any agreement between respondents and Lifetone until after the agreements were made; and respondents have the equipment.

The fact that respondents have the equipment is not material. In an action to recover on an illegal contract, this court leaves the parties where it finds them whether or not the situation is unequal as to the parties. *Sinnar v. LeRoy, supra; Hederman v. George, supra.* The facts, that appellant was not a party to the transaction and that it did not have knowledge of any agreement between Lifetone and respondents until after the agreements were made, are material. However, they must be considered with all the undisputed facts and circumstances.

At the outset, it should be noted that, in order for Lifetone successfully to employ its referral selling scheme, a finance company participation is required; that is, Lifetone must get its money before discontinuing sales. Accordingly, before Lifetone made any sales, it contacted appellant and explained the selling scheme. Appellant agreed to finance the contracts. In fact, Lifetone and respondents agreed at the time of contracting that the conditional sale contract would be assigned to appellant. It is hard to see that appellant is not in pari delicto with respondents; it was knowingly an integral part of the referral selling scheme. This fact substantially outweighs any innocence that may be otherwise evidenced by the facts that appellant was not a formal party to the sale contract and that appellant did not have knowledge of this particular transaction at the time of contracting.

Appellant, understanding the referral selling scheme, required respondents to agree that the obligation to appellant would be paid notwithstanding whether any commissions were paid under the referral selling agreement. This is the basis of appellant's next argument, that it can establish its case without relying on the illegal transaction because either there was independent consideration or respondents are estopped.

> An agreement will be enforced, even if it is incidentally or indirectly connected with an illegal transaction, provided it is supported by an independent consideration, or if plaintiff will not require the aid of the illegal transaction to make out his case  .  .  .  .  . 17 C.J.S. *Contracts* § 276, at 1201.

Respondents' promise to pay appellant the conditional sale contract notwithstanding the payment of any commissions was not supported by consideration. It was a mere naked promise. The conditional sale contract and the referral selling agreement had been executed prior to this time and the personal property and equipment therein described had already been received and installed in respondents' home.

Appellant's argument of estoppel or waiver is without legal basis.

> The nonenforcement of illegal contracts is a matter of common public interest, and a party to such contract cannot waive his right to set up the defense of illegality in an action thereon by the other party. . . . Validity cannot be given to an illegal contract through any principle of estoppel. *Reed v. Johnson,* 27 Wash. 42, 55, 67 Pac. 381 (1901).

*Accord, Cooper v. Baer,* 59 Wn.2d 763, 370 P.2d 871 (1962).

The judgment is affirmed.[3]

· ROSELLINI, C. J., DONWORTH, FINLEY, and WEAVER, JJ., concur.

March 9, 1966. Petition for rehearing denied.

[3]The Attorney General appeared amicus curiae through his Consumer Protection Division. It was his contention that the facts found by the trial court constituted a lottery. He further advised that, while not in issue, such referral sales schemes as lotteries or lottery devices constitute unfair trade practices and unfair methods of competition within the meaning of the Consumer Protection Act. RCW 19.86.020 provides: "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." As this is not in issue, this Court does not express an opinion thereon.