GOLD BOND STAMP COMPANY OF
GEORGIA, Plaintiff-Appellee-
Cross Appellant,

v.

BRADFUTE CORPORATION, Defendant-
Appellant-Cross Appellee.

Nos. 797–798, Dockets 34117, 34241.

United States Court of Appeals,
Second Circuit.

Argued May 17, 1972.

Decided June 22, 1972.

Joseph Chase, New York City (Cleary, Gottlieb, Steen & Hamilton, New York City, of counsel), for plaintiff-appellee-cross appellant.

Thomas B. Gilchrist, Jr., New York City (Averill M. Williams and Craig D. Walley, Bleakley, Platt, Schmidt, Hart & Fritz, New York City, of counsel), for defendant-appellant-cross appellee.

Before MOORE, SMITH and HAYS, Circuit Judges.

MOORE, Circuit Judge:

Gold Bond Stamp Company of Georgia (Gold Bond) brought this action against Bradfute Corporation (Bradfute) to recover damages for an alleged breach of an oral agreement. Jurisdiction was premised upon 28 U.S.C. § 1332(a) (1). The District Judge, sitting without a jury, found the facts to be favorable to the plaintiff's position, 303 F.Supp. 532. A judgment against Bradfute was accordingly entered in the sum of $125,436. Bradfute appeals from this judgment. Gold Bond cross-appeals on the failure of the District Court to award interest. As many of the issues on this appeal turn on an evaluation of the evidence, a rather lengthy recitation of the facts is required.

## I  The Facts

### The Parties

Gold Bond, a wholly-owned subsidiary of Gold Bond Stamp Company, was organized in early 1960 to promote and operate the Gold Bond Stamp Plan in the southeastern region of the United States. Under the Plan, Gold Bond engages retail stores as licensees of Gold Bond Stamps. A retailer's customer then receives stamps for purchases made, saves the stamps and ultimately redeems them for various articles of merchandise. Retail stores, by becoming licensees, are apparently able to increase their sales.

The incorporation of Gold Bond in 1960 was prompted by negotiations between the parent Gold Bond Company and Colonial Stores, Inc. (Colonial), a retail food supermarket chain located in southeastern United States. Shortly after the incorporation, Colonial became Gold Bond's major licensee in that region of the United States.

Bradfute designs sales-building games and contests and sells them to retail stores. In general, Bradfute also operates the promotion in behalf of the stores.

The dispute between Gold Bond and Bradfute is the result of errors which appeared in a sales promotion game which was purchased by Colonial. Prizes in the game were filled Gold Bond Stamp Books. The errors enabled an unexpectedly large number of Colonial's customers to win the prizes offered. At issue is the question of whether Bradfute should bear the cost of the errors.

### The Agreement

In the spring of 1961 Howard Bradfute, president of Bradfute, communicat-

ed with Charles Johnston, business manager of Colonial, to determine whether Colonial was interested in purchasing a sales promotion game for the coming fall. Mr. Johnston indicated that Colonial, which had previously purchased a promotional game from Bradfute, was interested and suggested that Howard Bradfute talk to Warren Carlson of Gold Bond to determine whether Gold Bond stamps could be used as game prizes. Mr. Bradfute indicated that this was satisfactory as Gold Bond had been involved in other promotions.

Prior to this initial presentation of the plan to Colonial, Bradfute had also communicated with personnel of Gold Bond to interest the Company in a possible Bradfute-Colonial promotional program. As a result of these communications and the conversations with Mr. Johnston, Howard Bradfute arranged to meet representatives of Gold Bond on June 1, 1961, the day before Bradfute's promotional plan was to be formally presented to Colonial.

At the June 1 meeting, Mr. Bradfute described the promotional game to Gold Bond's representatives including Mr. Carlson. As then described, the promotion would be a bingo-type game. Game cards would first be distributed to Colonial's customers. Colonial would then publish a list of numbers, furnished by Bradfute, in local newspaper advertisements. The customers would match the numbers to those appearing on their cards and if they were able to match a complete row, they would win the prize indicated on the card. This process would be repeated each week as new cards would be distributed.

During the course of this presentation, Mr. Bradfute emphasized the benefits which would accrue to Gold Bond if it agreed to furnish filled stamp books as prizes. These benefits were premised upon the projections of increased traffic and sales in the Colonial stores. As people became interested in the game, Colonial's sales would presumably increase. This increase would generate an in-

crease in the use of Gold Bond stamps and Gold Bond would enjoy greater sales.

In addition to the oral explanation of how Gold Bond would benefit from the game, Mr. Bradfute handed the Gold Bond representatives a letter which began: "[t]he program we offer Gold Bond is quite simple." This letter contained a projection as to the cost to Gold Bond for its participation and an enumeration of the reasons why Gold Bond would benefit if it supplied the prizes.

Gold Bond's representatives recognized the fact that their company could only benefit if the number of prizes could be limited. In response to questions as to the number of books Gold Bond would be required to distribute, Mr. Bradfute assured the representatives that the game was absolutely controlled by a mathematical formula. In addition to the oral assurance, Mr. Bradfute handed them promotional material which had been prepared for a similar game. This material contained a "guarantee" that the mathematical formula would limit the total prize cost. The material also assured Gold Bond that the promotion was legal. Specifically, the material stated:

"Full Legal Protection is guaranteed by contract. Thoroughly checked for legality in your area before we start."

To further induce Gold Bond's participation, Bradfute agreed to pay Gold Bond $2.00 for every 1,000 cards sold to Colonial to defray some of Gold Bond's expenses. In addition, Bradfute agreed to include Gold Bond's secondary licensees (such as drug stores and gasoline stations) in the promotion if Colonial had no objection.

After this presentation, Gold Bond's representatives stated that Gold Bond would furnish the prizes if Colonial accepted the promotion.

The following day, June 2, 1961, Mr. Bradfute and two Gold Bond representatives met with Charles Johnston. Mr. Bradfute again described the game and indicated how it would be operated to

the benefit of Colonial. Mr. Johnston was also informed that Gold Bond had agreed to furnish the prizes. Colonial's representative indicated that the proposal was acceptable and agreed to include Gold Bond's associate accounts in the promotion.

Subsequently, on August 17, 1961, Bradfute and Colonial signed a contract to conduct the promotional game for an eight-week period. The contract recited that "2,101 prizes, amounting to 7,203 filled books of Gold Bond Trading Stamps will be offered." Gold Bond was not a party to this contract. However, shortly after the contract was signed, Gold Bond received a prize breakdown sheet dated August 21, 1961, from Mr. Bradfute. This sheet detailed how many of the 7,203 books could be won each week.

In September Bradfute and Colonial agreed to the manner in which winning cards would be handled. Gold Bond's sole duty was to send prizes to the winners after they had been certified by Bradfute.

*The Errors in the Game*

On October 2, 1961, the game was introduced to the public by Colonial in its retail stores in Atlanta, Georgia. Within two days Colonial learned that a number of its customers were claiming to have won prizes of 100 books. According to the prize breakdown sheet there were to be no 100-book winners in the first week. When Mr. Bradfute was informed of these claims he advised Gold Bond and Colonial that the customers were probably in error. By October 3, it became evident that Bradfute, not Colonial's customers, had made an error.

The extra 100-book winners were created by the appearance of the number "44" on some playing cards and in the newspaper advertisements. This number was erroneously placed on some cards during the printing process. Ordinarily, Bradfute's employees check the cards it receives from the printer to insure that the numbers fit the prescribed mathematical formula. While an employee checked the cards in this instance, he failed to find and remove the defective cards.

After the source of the error was discovered, Bradfute recommended that the defective cards be removed from the stores and that corrective changes be made in Colonial's advertisements. As a result of these changes, Colonial was able to prevent approximately 2,300 defective cards from reaching its customers. The advertising changes further minimized the potential loss.

Unfortunately, while these actions served to minimize the loss, they created some public relations problems for Colonial. Some of the customers were able to detect the changes made in the advertisements and charged that the game was fixed.

A second error was subsequently discovered. By this error additional 2-book winners were created. Apparently the source of this error was similar to that of the 100-book error. As with the prior error, Bradfute's employees failed to detect it.

After this second error was discovered, Mr. Bradfute, in a letter dated October 18, 1961, offered to "reimburse you [Gold Bond] for the additional two book winners over and above the 30 we should have had in week No. 1." Gold Bond agreed to the reimbursement but refused to accept the enclosed check because it was inadequate.

A third error developed in the closing weeks of the game. This one created additional 200-book winners. Bradfute first informed Gold Bond and Colonial of this error on December 27, 1961, weeks after the promotion was completed.

After the extent of the errors became known, Bradfute suggested that the winners not be awarded prizes and proposed that a "special" contest be held for the winners or that the winners be approached to determine whether they would accept smaller prizes. Bradfute also offered to publish an apology accepting responsibility for the errors.

Gold Bond was represented at these discussions but took no position. Colonial insisted that the prizes be distributed. It refused to further jeopardize its public image. Bradfute acquiesced. Thereafter, while Bradfute continued to certify prize winners, Gold Bond was notified to "take care of these [winners] as per your instructions from Colonial Stores."

## II  Questions of Law [1]

The cornerstone of appellant's argument is that the District Court erroneously found that Gold Bond orally agreed with Bradfute to furnish filled stamp books as prizes. Bradfute contends that Gold Bond's obligation to furnish the prizes was to Colonial; accordingly, Bradfute asserts that Colonial should have been the defendant in this action. After a careful review of the facts, we conclude that the District Court was not in error.

It is apparent that Bradfute was desirous of involving both Gold Bond and Colonial in its promotional venture. To this end Gold Bond was informed of Bradfute's intention to present a promotional program to its new major licensee Colonial, and Colonial was informed of Bradfute's prior programs involving Gold Bond. Bradfute's business initiative made the June 1 meeting between Mr. Bradfute and the Gold Bond representatives possible.

As Mr. Bradfute entered the June 1 meeting he knew that in order to sell the promotion to Colonial it was imperative to arrange for Gold Bond's participation during that meeting. Mr. Johnston of Colonial specifically requested that the promotion prizes be Gold Bond stamp books and Mr. Bradfute had to present Colonial with the results of this request the following morning. Thus, Mr. Bradfute was well prepared to convince Gold Bond's representatives to participate.

Orally, Mr. Bradfute described the monetary benefits which would accrue by virtue of participation. He emphasized that costs would be minimal and that his organization would be responsible for virtually the entire operation of the game. In addition, a written memorandum addressed to Mr. Carlson, one of Gold Bond's representatives, further elaborated upon the benefits of Bradfute's "offer." When questioned as to the number of prizes, Mr. Bradfute assured the representatives of the dependability of the mathematical formula. He offered to help defray Gold Bond's expenses and also agreed to include Gold Bond's associate accounts in the promotion if such was acceptable to Colonial. It was only after these specific items were agreed upon that Gold Bond agreed to furnish the stamp books as prizes. These facts evidence the existence of the oral agreement between Gold Bond and Bradfute.

Additional support for the District Court's finding is in the exchange of letters concerning the 2-book error. Bradfute's offer to "reimburse" Gold Bond for the resulting loss does evidence the existence of a prior agreement.

By this recitation of the evidence we do not imply that appellant's argument is without force. Undoubtedly, it was Colonial's insistence that the prizes be issued that forced both Gold Bond and Bradfute to continue sending the winners their prizes. Gold Bond could not afford to resist. However, these facts were not sufficient to establish the existence of an oral Gold Bond-Colonial agreement in the District Court and are certainly insufficient to require a reversal of the finding that Gold Bond's obligation to furnish the prizes was to Bradfute.

Appellant also contends that even had there been an agreement between the parties for a supply of game prizes, no breach of a representation or warranty

---

1. Since the contract was entered into and performed in the State of Georgia, and since the parties stipulated that Georgia law applies, the District Court properly found that Georgia law applies.

was established. This contention is without merit.

Throughout the negotiations, Bradfute assured Gold Bond that 7,203 was the maximum number of books it would be required to furnish. This assurance was fundamental to Gold Bond's decision to participate; it could not benefit if the number of prizes was unlimited. This assurance was, in effect, a warranty that was breached when the number of prizes exceeded 7,203 filled stamp books.

■ Bradfute also contends that it was denied the right it reserved to correct typographical errors. Gold Bond does not dispute the existence of this right but contends that the errors were not typographical and, in any event, Bradfute was permitted to "correct" any errors.

We need not determine whether the errors were typographical because Bradfute was permitted to do all that was reasonable to soften the impact of the errors. At Bradfute's request defective cards were destroyed, advertisements were changed and many cards were reprinted. Only one request was denied and that denial came from Colonial. Colonial reasonably refused to further impair its public image when Bradfute suggested that the winners not be given the prizes they had won. Bradfute was not denied any right under its agreement with Gold Bond.

For similar reasons, the contention that Gold Bond's damages were self-inflicted or that there was a failure to mitigate damages is without merit. Gold Bond cooperated fully in the attempts to limit the damages proximately caused by Bradfute's errors.

Of more merit is the contention [2] that the agreement to furnish prizes is unenforceable because the promotion was an illegal lottery under Georgia law.[3] Gold Bond responds to this contention by claiming that its agreement was merely collateral to the illegal promotion and is therefore enforceable. Gold Bond also asserts that Bradfute should not be permitted to raise this defense because Gold Bond relied upon Bradfute's representation that the promotion was legal.

■ Georgia law unfortunately offers no precise answer to the issue before us. Initially, a Georgia court would enforce a collateral agreement if the consideration for the agreement was "new and distinct" and therefore, untainted by the illegal agreement. *Cf.,* Howell v. Fountain, 3 Ga. 177 (1847). Later cases modified this somewhat mechanical rule and focused upon the conduct of the parties. Thus, if the party seeking to enforce the collateral agreement merely had knowledge of the other's illegal purpose, the agreement is enforceable. *Cf.,* Hines v. Union Savings Bank & Trust Co., 120 Ga. 711, 48 S.E. 120 (1904); Mechanics' Realty & Improvement Co. v. Leva, 16 Ga.App. 7, 84 S.E. 222 (1915). The issue of enforceability becomes clouded, however, when the party seeking to enforce the agreement not only knew of the other's illegal purpose but also participated in it. Early Georgia cases indicate that any degree of participation would make the agreement unenforceable. *See, e. g.,* Singleton v. Bank of Monticello, 113 Ga. 527, 38 S.E. 947 (1900). More recent cases, however, indicate that a party's peripheral participation in the illegal scheme of the other, in addition to knowledge that the scheme is illegal, does not necessarily prevent

2. We find, contrary to appellee's suggestion, that the District Court properly permitted Bradfute to amend its complaint to include this defense. Appellee was in no way prejudiced by the amendment and Bradfute's explanation that its research had recently disclosed this possible defense was adequate under the circumstances of the case.

3. Gold Bond did not seriously dispute the illegality of the promotion. Ga.Code Ann. §§ 26–6501, 26–6502; *see,* Boyd v. Piggly Wiggly Southern, Inc., 115 Ga. App. 628, 155 S.E.2d 630 (1967); Kelly v. Banda, 116 Ga.App. 421, 157 S.E.2d 782 (1967).

that party from having a collateral agreement enforced. *See, e. g.,* Bernstein v. Peters, 69 Ga.App. 525, 26 S.E. 2d 192 (1943). In *Bernstein,* a party which not only delivered liquor it knew was to be involved in an illegal tax avoidance scheme but also explained how the scheme might be implemented was permitted to bring an action for the purchase price of the liquor. The court reasoned that if the delivery was lawful and if no further aid was rendered after the delivery, the collateral agreement would be enforceable. Counsel have not cited and research has failed to disclose any further case delimiting the degree of participation which will make a collateral agreement unenforceable.

■ While none of the above cases states that an unwitting participant in an illegal scheme can enforce a collateral agreement, it appears that such a conclusion is, *de facto,* required. Here, not only was Gold Bond unaware it was participating in an illegal sales promotion, its participation in the operation of the promotion was minimal. It merely supplied the prizes at Bradfute's direction. It is therefore concluded that the collateral prize agreement is enforceable.

We need not, however, rest our determination on this conclusion alone. Even if the collateral agreement were tainted by the illegality, Georgia law would still require finding the agreement enforceable.

■■ While illegal contracts are, as a general rule, unenforceable, Georgia courts have noted:

> "there are instances in which contracts may be immoral or illegal but the parties to which are not equally culpable, and where, because of such inequality of guilt, the agreement may be enforced at the instance of the one less at fault."[4]

Herein, Bradfute not only convinced Gold Bond to participate in the promotion after representing that it was legal,[5] though, in fact it did not know whether its representation was true, but also created, designed and supervised the entire promotion. In addition, its negligence was the cause of the errors which appeared in the game. Under these circumstances, we find that the parties are not *in pari delicto.*

As appellant's final contention that "the damages were not established by credible competent evidence" is without merit, the award of damages is affirmed.

■ Gold Bond's cross-appeal from the failure of the District Court to award interest is similarly without merit. As the District Court could reasonably conclude that the damage claim was unliquidated, it was not required to award interest. Lincoln Lumber Co. v. Keeter, 167 Ga. 231, 145 S.E. 68 (1928). Under the circumstances of this case, the failure to award interest was not error.

Affirmed.

---

4. McClure v. Farmers' & Merchants' Bank, 39 Ga.App. 753, 759, 148 S.E. 341, 344 (1929).

5. While Gold Bond was probably not justified in relying upon the representation of legality, see *Bernstein, supra,* this reliance is certainly a factor to be considered when determining whether the parties are *in pari delicto. Compare,* Wolk v. Benefit Association of Railway Employees, 172 F.Supp. 62 (W.D.Pa.1959); Restatement of Contracts § 599.