[No. 47422–2.   En Banc.   January 15, 1982.]

ROBERT W. GOLBERG, ET AL, *Petitioners,* v. JOHN
SANGLIER, ET AL, *Respondents.*

*Shidler, McBroom, Gates & Baldwin,* by *James R. Irwin* and *Creighton, Scott & Schmitt,* by *Gordon L. Creighton,* for petitioners.

*John M. Woodley* and *Edwards & Barbieri,* by *Malcolm L. Edwards* and *Charles K. Wiggins,* for respondents.

[As amended by order of the Supreme Court June 23, 1982.]

UTTER, J.—Petitioners Robert Golberg and Miriam Pierce seek review of the Court of Appeals reversal of the trial court's judgment in their favor and its dismissal of petitioners' claim against their former partners, respondents John D. Sanglier and Nick Carras. Petitioners received an award of damages based on the trial court's finding that the sale of their partnership interest to the remaining partners was induced by fraud. The Court of Appeals reversed the trial court and dismissed petitioners' case with prejudice, finding the partnership agreement was illegal and thus unenforceable. We review that decision here, reversing the Court of Appeals and remanding for

consideration of issues not addressed in this petition for review.

Respondent John D. Sanglier applied to General Motors in 1973 for a Cadillac dealership. Sanglier had been general sales manager for Carras Cadillac, Inc., which voluntarily terminated its franchise early in 1974. The Motors Holding and Cadillac divisions of General Motors required Sanglier to provide 25 percent of the franchise capital requirements, $100,000 in unencumbered funds. In return, Motors Holding would provide the remaining 75 percent of the initial capital requirements and become majority stockholder and only voting stockholder.

In March 1974, Sanglier contacted petitioner Golberg, who eventually agreed, along with petitioner Pierce, to put up the $100,000 needed by Sanglier in return for a 3–way partnership. In April 1974, the three met in a Tacoma attorney's office to discuss forming a partnership. They agreed that the two investors would each have a 25 percent interest in the partnership and that Sanglier, who was to make no capital investment, would be the dealer and have a 50 percent interest in the partnership. Eventually, Nick Carras also joined the partnership: Carras, Golberg and Pierce each provided $33,333.33.

The next month the group met at the office of their Tacoma attorney and conferred with his partner. They discussed nondisclosure to Motors Holding and Cadillac of the true source of Sanglier's funds, and that Sanglier had already represented to Cadillac, and would represent to Motors Holding, that the funds were a gift from his mother–in–law. The attorney advised the group that Sanglier's statements might be a misrepresentation.

Motors Holding decided that an Oldsmobile franchise would have to be teamed with the Cadillac franchise which called for a further investment by Sanglier of $25,000. Pierce, Golberg, and Carras each contributed their pro rata share of the $25,000, bringing the total capital investment of each to $41,666.

Motors Holding and Sanglier entered an agreement to

buy the Carras Cadillac real property, buildings, and equipment, and in August 1974, Motors Holding formed Sanglier Cadillac–Oldsmobile, Inc., a Delaware corporation. Sanglier acknowledged, as was required by the Cadillac and Motors Holding divisions, that the $125,000 investment was his own money free and clear of any present or future right, claim, or interest of any kind. Motors Holding came up with another $645,000, part of which represented a loan to the dealership. The rest was taken in preferred and common stock. Motors Holding took all the voting stock. Sanglier was retained as president of the dealership.

In December, the four partners—Sanglier, Carras, Pierce and Golberg—executed a document entitled "Partnership Agreement", which provided the partnership should remain undisclosed and that none of the profits would be shared until Motors Holding was paid in full. Sanglier would devote his dividends and one–half of his salary bonus to paying Motors Holding, but he could retain his salary. Stock and notes he purchased would go into escrow for the partnership, to be transferred when Motors Holding was paid in full. From that point, each partner would share 25 percent of the partnership profits and losses.

In the fall of 1975, the partners met to discuss the possible sale of the partnership to another dealer. Late that fall or early the next year, Sanglier told Golberg the deal was off, though he actually continued to negotiate and eventually entered into an option agreement, taking $165,000 in option money. Carras knew about this deal, and with this money Sanglier bought Carras' share of the partnership, paid off some debts to Carras, and used the rest for personal reasons. Carras also agreed to assist Sanglier in buying out the other two partners who were not told about any of these transactions.

Between July and December 1976, Carras attended four partnership meetings, pretending he was still a partner. He told Pierce and Golberg that Sanglier was mismanaging the business, not acting in the best interest of the partnership, drinking and gambling excessively, and that they would be

lucky to get their initial investment back.

In mid–December, Sanglier with Carras cosigning, borrowed $85,000 from a bank. On December 20, Sanglier bought out the interests of petitioners Golberg and Pierce by giving each a check for $41,666, the amount of their capital investment. Carras, whose interest had already been purchased by Sanglier, was also given a check which he had agreed in advance to tear up. Golberg and Pierce were not told about the loan that Carras cosigned. The parties signed a document drafted by Carras that purported to "terminate, dissolve and wind up" the partnership created on December 1, 1974.

In March 1978, Golberg and Pierce found out about Sanglier's option agreement to sell the dealership. Sanglier orally offered to let them back into the partnership if each would return the $41,666, pay a pro rata share of his start–up costs and premiums, and sign on the contingent liability of the dealership that he was personally guaranteeing. They declined.

The option agreement was never consummated and Sanglier repaid the $165,000 to the prospective purchaser in May 1978.

In March 1978, Golberg and Pierce commenced this action, seeking damages under the partnership agreement based on fraud, breach of the partnership agreement and fiduciary duties, and violation of RCW 21.20.010 of the Washington securities laws. The plaintiffs sought to rescind the sale of their partnership interests or, in the alternative, to be awarded damages.

The trial court held in favor of petitioners, awarding each $261,917.32, their shares of the fair market value of the dealership/partnership as of the date they discovered Sanglier's and Carras' breach of their partnership duties. The Court of Appeals reversed the trial court and dismissed the complaint with prejudice. The appellate court held that the defendants Sanglier and Carras had standing to raise the defense of illegality of the partnership, and that such defense defeated any claims Golberg and Pierce had under

the partnership agreement. This court granted Golberg's and Pierce's petition for review.

I

■ If a contract is illegal, our courts will leave the parties to that contract where it finds them. *State v. Northwest Magnesite Co.,* 28 Wn.2d 1, 26, 182 P.2d 643 (1947). The same rule applies if the contract grows immediately out of and is connected with an illegal act. *Waring v. Lobdell,* 63 Wn.2d 532, 533, 387 P.2d 979 (1964). The Court of Appeals refused to entertain petitioners' claim based on the partnership agreement because the agreement had the effect "of deceiving Motors Holding . . . contrary to RCW 21.20.010(3) and the public policy underlying RCW 21.20-.010(2) . . ." *Golberg v. Sanglier,* 27 Wn. App. 179, 195, 616 P.2d 1239 (1980).

We will analyze each of the Court of Appeals findings of illegality.

A

RCW 21.20.010(2) states that it is unlawful for any person in connection with the purchase of any security

> To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . .

The Court of Appeals found that Sanglier violated this part of the act in his misrepresentation to Motors Holding that the funds constituting the 25 percent capital investment were his "'own funds, free and clear of any present or future right, claim or interest of any kind.'" *Golberg v. Sanglier, supra* at 192. The Court of Appeals determined these funds were not free and clear but were encumbered in that "[t]he dealer's interest, represented by stock, was required . . . to be placed in escrow . . ." *Golberg v. Sanglier, supra* at 192.

Although we do not doubt that Sanglier's representation as to the status of his funds was "material" to the transaction, we must question the Court of Appeals conclusion

that such representation was "untrue." The escrow requirement, upon which the Court of Appeals relied for its finding of untruthfulness, did not relate to the initial capital investment Sanglier was required by Motors Holding to provide. It related only to the profits from the dealership, and Motors Holding did not require that the profits of the dealership be unencumbered. They required only that the 25 percent investment be unencumbered. Thus, the Court of Appeals did not provide a valid basis for reversing the trial court and finding that the capital contribution provided by Sanglier was encumbered.

No argument is proffered to discredit the trial court's finding of fact No. 15 which states, in part: "There was no provision for repayment, or interest on the money invested, and in the event the business failed, neither Sanglier nor the partnership had an obligation to repay plaintiffs' investment"; or the trial court's finding of fact No. 17 which states, in part: "The partnership agreement provided that profits would not be shared by any of the partners until such time as Motors Holding had been paid in full." In essence, the agreement was designed to give the funds to Sanglier free and clear, with a right to profits accruing to the partnership only after the transaction with Motors Holding was completed. The trial court's conclusion of law that the partnership agreement was not an illegal contract indicates that it considered the funds unencumbered.

Even if the trial court did not explicitly state that the funds were not encumbered, any such silence must be interpreted as a finding that the funds were not encumbered since respondents had the burden of persuasion in presenting this defense. *Batten v. Abrams,* 28 Wn. App. 737, 626 P.2d 984 (1981).

Although doubt should be resolved in favor of petitioners as to whether Sanglier misrepresented the *status* of his funds, there is no question that he misrepresented the *source* of his funds.[1] He told Motors Holding and Cadillac

---

[1]The Court of Appeals appears to have had difficulty keeping separate con-

that the funds were a gift from his mother–in–law while the funds were actually provided by the partnership. However, neither the trial court nor the Court of Appeals found that Sanglier's misrepresentation as to the *source* of his funds was "material" to the transaction, as is required for a violation of section 2 of the act. And it is not clear to us whether such misrepresentation was material to the transaction.[2] In light of both lower courts' findings with respect to Sanglier's misrepresentation as to the source of his funds, we hold that a violation of RCW 21.20.010(2) is not established.

### B

The Court of Appeals also found that the partnership agreement violated section 3 of RCW 21.20.010, which makes illegal "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." We agree that Sanglier's misrepresentation as to the source of his funds and the partnership's agreement to perpetuate this misrepresentation by requiring nondisclosure of its existence did "operate as a fraud or deceit" upon Motors Holding in contravention of section 3. Nonetheless, the extent to which petitioners are culpable must be fully understood. The partnership agreement was designed to give Sanglier the 25 percent capital investment as his own unencumbered funds. There is substantial support in the record to support a finding that the funds were his own and were unencumbered. His misrepresentation that the funds came from his mother–in–law does not eradicate the

cerns about the status and source of the funds as exemplified in its statement: "The plaintiffs, aware of Motors Holding's requirement regarding unencumbered funds [which concerns the status of the funds], knew that Sanglier had misrepresented and would misrepresent the *source* of his funds to Motors Holding." (Italics ours.) *Golberg v. Sanglier*, 27 Wn. App. 179, 194, 616 P.2d 1239 (1980).

[2]If, for all intents and purposes, the money was Sanglier's to give, it is not clear what the importance to Motors Holding of knowing the source of that money might be. There is no evidence in the record that Motors Holding would have been concerned with the source of the funds as long as the funds were in fact Sanglier's free and clear.

partnership's attempt to comply with Motors Holding's and Cadillac's requirements for the transaction and petitioners' belief that what they were doing was legal. While the entire partnership would have been civilly liable for Sanglier's violation of section 3[3] such liability is not dispositive of the question whether the parties were in pari delicto. The Court of Appeals seems implicitly to have relied on this assumption. *Golberg v. Sanglier, supra* at 195. While both parties may be equally liable to third parties for the illegality of their transaction, they may not necessarily be in pari delicto. *See Nathanson v. Weis, Voisin, Cannon, Inc.,* 325 F. Supp. 50 (S.D.N.Y. 1971). *See generally* Annot., 26 A.L.R. Fed. 682 (1976).

## II

Having determined the extent to which the partnership agreement is unlawful, we must still examine the question whether petitioners were in pari delicto with respondents. The trial court found, in its conclusion of law No. 13, that petitioners were not in pari delicto. The Court of Appeals did not overrule this conclusion of law by the trial court, but stated only: "even if the plaintiffs were not in pari delicto, they would be limited to disaffirming their agreement and recovering the funds they paid under it." *Golberg v. Sanglier, supra* at 197.

■■ Before proceeding to a discussion of the merits of this part of the Court of Appeals holding, we must first reflect upon the purposes of the rule of in pari delicto. The maxim "in pari delicto potior est conditio defendentis" declares that the defendant will prevail when the parties are of equal guilt. *See generally* Wade, *Restitution of Benefits Acquired Through Illegal Transactions,* 95 U. Pa. L. Rev. 261 (1947); *Nathanson v. Weis, Voisin, Cannon, Inc., supra.* Where the parties are not equally culpable, the

---

[3]Petitioners' claim is based on the partnership agreement and therefore not severable from the illegality or sufficiently remote from that illegality to justify our ignoring the illegality of the partnership agreement. *See Sherwood & Roberts-Yakima, Inc. v. Leach,* 67 Wn.2d 630, 409 P.2d 160, 14 A.L.R.3d 1411 (1965).

defense of in pari delicto is not appropriate. *Id.* Where the conduct of the party who seeks to enlist support of the doctrine outrages public sensibilities more than the conduct of the party against whom the doctrine is sought to be applied, courts will not support application of the rule. *Contractor Indus. v. Zerr,* 241 Pa. Super. 92, 359 A.2d 803 (1976); *Southern States Life Ins. Co. v. McCauley,* 81 N.M. 114, 464 P.2d 404 (1970).[4] To say a party is not in pari delicto is only to use "a linguistic method for avoiding unduly harsh application of the maxim without presenting any appearance of inconsistency." Wade, *supra* at 280. Numerous courts have permitted actions based on the differential fault of the parties. *See, e.g., Nathanson, supra; Emmons, Williams, Mires & Leech v. State Bar,* 6 Cal. App. 3d 565, 86 Cal. Rptr. 367 (1970); *Karpinski v. Collins,* 252 Cal. App. 2d 711, 60 Cal. Rptr. 846 (1967).

Ultimately, a decision as to whether a party is in pari delicto relies on public policy considerations and not a neat calculus for determining differential fault. The fundamental concern that should guide a court in making its decision is whether the "public good [will be] enhanced." *Duddy–Robinson Co. v. Taylor,* 137 Wash. 304, 308, 242 P. 21 (1926). Of course, public policy "is a very unruly horse, and when once you get astride it you never know where it will carry you." *Richardson v. Mellish,* 130 Eng. Rep. 294, 303 (1824) (Burrough, J.). But whether or not the court finds a plaintiff in pari delicto the court "is already astride the unruly horse; it is now concerned merely with trying to determine the direction in which that unpredictable steed will bear it." Wade, *supra* at 297.

The key to a determination of this nature is whether our decision will be more likely to prevent such illegal transactions in the future. There are two policy implications of the

---

[4]A court's refusal to apply the rule to benefit an unscrupulous defendant should be distinguished from a defendant's standing to raise the defense. While respondents have standing to raise the defense of in pari delicto, *see Sinnar v. LeRoy,* 44 Wn.2d 728, 270 P.2d 800 (1954), public policy considerations may nevertheless dictate that the defense, when raised, be unsuccessful.

Court of Appeals holding: first, unwary investors who enter questionably legal transactions are on notice they are subject to fraud and deceit without legal recourse; second, opportunists such as Sanglier are encouraged to draw such unwary persons into questionable investment schemes, return their initial investment under fraudulent pretenses, and dupe them out of their profits, all with full assurance that they will be insulated from legal recourse. These implications are inconsistent with the purposes of the rule of in pari delicto.

> These rules are intended to prevent the guilty party from reaping the benefit of his wrongful conduct, or to protect the public from the future consequences of an illegal contract. They do not necessarily apply to both parties to the agreement unless both are truly *in pari delicto*. . . . [T]he courts should not be so enamored with the Latin phrase '*in pari delicto*' that they blindly extend the rule to every case where illegality appears somewhere in the transaction. The fundamental purpose of the rule must always be kept in mind, and the realities of the situation must be considered. Where, by applying the rule, the public cannot be protected because the transaction has been completed, where no serious moral turpitude is involved, where the defendant is the one guilty of the greatest moral fault, and where to apply the rule will be to permit the defendant to be unjustly enriched at the expense of the plaintiff, the rule should not be applied."

*Tri–Q, Inc. v. Sta–Hi Corp.,* 63 Cal. 2d 199, 218–19, 404 P.2d 486, 45 Cal. Rptr. 878 (1965). In order to best effectuate the purposes of the rule, enforcement of the plaintiff's claim may be appropriate:

> In some cases . . . effective deterrence is best realized by enforcing the plaintiff's claim rather than leaving the defendant in possession of the benefit; or the forfeiture resulting from unenforceability is disproportionately harsh considering the nature of the illegality. In each such case, how the aims of policy can best be achieved depends on the kind of illegality and the particular facts involved.

*Lewis & Queen v. N.M. Ball Sons,* 48 Cal. 2d 141, 151, 308 P.2d 713 (1957). As Mr. Justice Holmes has stated: "But a

person does not become an outlaw and lose all rights by doing an illegal act. The right not to be led by fraud to change one's situation is anterior to and independent of the contract." (Citation omitted.) *National Bank & Loan Co. v. Petrie,* 189 U.S. 423, 425, 47 L. Ed. 879, 23 S. Ct. 512 (1903). The plaintiff's right not to be defrauded is anterior if he or she can demonstrate he or she is not in pari delicto. 6A A. Corbin, *Contracts* § 1529 (1962).

In applying these public policy concerns to this case, numerous factors surface that support the trial court's conclusion of law that petitioners were not in pari delicto. First, the trial court found that petitioners "did not at any time intend to enter an illegal contract or to damage Motors Holding or General Motors." Finding of fact No. 12. While petitioners' lack of illegal intent may be irrelevant to finding an act illegal under certain provisions of the state's securities laws, *see Kittilson v. Ford,* 93 Wn.2d 223, 608 P.2d 264 (1980), lack of scienter is relevant to determining whether a party is in pari delicto. *Oakes v. Guarantee Ins. Co.,* 573 S.W.2d 899 (Tex. Civ. App. 1978). Even an unreasonable belief that the transaction is legal may provide the basis for finding a party not in pari delicto. *Gold Bond Stamp Co. v. Bradfute Corp.,* 463 F.2d 1158 (2d Cir. 1972).

The trial court also found petitioners "had no prior experience in the automobile business, and relied on the experience and knowledge of the defendants." Finding of fact No. 13. One commentator has stated that when a "defendant is engaged in transactions of this sort as a kind of business . . . [c]ourts are loath to see a professional profiting from his iniquitous business . . ." Wade, *supra* at 277. *See also Smith v. Turner,* 238 Cal. App. 2d 141, 47 Cal. Rptr. 582 (1965).

It is true that one of the advising attorneys offered that Sanglier's statements to Motors Holding "might be" a misrepresentation. This speculation was apparently resolved in favor of the transaction's legality since both the attorneys and petitioners were under the impression that the partnership agreement was legal when created. In retrospect, we

may condemn petitioners' actions, but as one commentator has stated:

> The careful and the timorous may avoid worries and possible penalties by following such advice as "When the matter is doubtful, don't"; but such a practice may unnecessarily limit his own enterprise and the general prosperity as well.

6A A. Corbin, *Contracts* § 1374 (1962).

The trial court's finding that petitioners were not in pari delicto is supported by substantial evidence. Still to be resolved is whether the Court of Appeals correctly concluded that petitioners' relief was limited to "disaffirming their agreement and recovering the funds they paid under it." *Golberg v. Sanglier,* 27 Wn. App. 179, 197, 616 P.2d 1239 (1980). The rule articulated by Williston seems to support the Court of Appeals position:

> Probably no more exact principle can be laid down than this, that if a plaintiff although culpable has not been guilty of moral turpitude, and the loss he will suffer by being denied relief is wholly out of proportion to the requirements either of public policy or of appropriate individual punishment, he may be allowed to recover back the consideration with which he has parted.

15 S. Williston, *Contracts* § 1789, at 358 (3d ed. 1972). Recovery of consideration is a restitutionary remedy, and it would appear that Williston's conclusion is based on earlier authority that limited parties not in pari delicto to restitutionary remedies. *See* Wade, *supra*; Corbin, *supra* at §§ 1373, 1374. Unlike Williston, Corbin states that when a party is not in pari delicto he is entitled to some legal remedy and that "[o]ur legal system provides a good variety of legal remedies and they are applied by the courts with a high degree of flexibility." Corbin, *supra* at § 1373. Many courts have demonstrated this flexibility in shaping a full range of remedies to parties not in pari delicto. *See, e.g., Sherwood & Roberts–Yakima, Inc. v. Leach,* 67 Wn.2d 630, 409 P.2d 160, 14 A.L.R.3d 1411 (1965); *Gold Bond, supra; Nathanson, supra; Felix v. Zlotoff,* 90 Cal. App. 3d 155, 153 Cal. Rptr. 301 (1979); *Homestead Supplies, Inc. v. Execu-*

*tive Life Ins. Co.*, 81 Cal. App. 3d 978, 147 Cal. Rptr. 22 (1978); *Vitek, Inc. v. Alvarado Ice Palace, Inc.*, 34 Cal. App. 3d 586, 110 Cal. Rptr. 86 (1973). The trial court imposed a restitutionary remedy in finding that Sanglier held the profits of the dealership in constructive trust.

> A constructive trust is imposed not because of the intention of the parties but because the person holding the title to property would profit by a wrong or would be unjustly enriched if he were permitted to keep the property.

Restatement of Restitution § 160, at 642 (1937). The trial court's remedy is exemplary of the kind of flexibility courts need in shaping restitutionary remedies for plaintiffs not in pari delicto. If the trial court were rigidly limited to the remedy discussed in Williston, *supra,* justice could not be rendered. While recovery of initial consideration will usually be sufficient, it is not adequate as the only available remedy. Respondents' entire scheme to defraud their partners was based on returning petitioners' initial consideration so to deprive them of profits. Sanglier was unjustly enriched with profits and it is that inequity the trial court sought to rectify in providing its remedy.[5]

---

[5]RCW 21.20.430(5) provides:

> No person who has made or engaged in the performance of any contract in violation of any provision of this chapter . . . or who has acquired any purported right under any such contract with knowledge of the facts by reason of which its making or performance was in violation, may base any suit on the contract.

Read literally, this provision would preclude innocent purchasers, whom the act seeks to protect, from bringing actions against sellers if the purchasers were aware of the facts composing the basis for the sellers' illegal actions. Such preclusion would eviscerate the purposes of the act; innocent purchasers are often aware of such facts without knowing they constitute some illegality. Even where the purchaser merely knew or participated in the violation of the act, the purposes of the securities act might be better served by enforcing a purchaser's claim. *Pearlstein v. Scudder & German,* 429 F.2d 1136 (2d Cir. 1970), *cert. denied,* 401 U.S. 1013, 28 L. Ed. 2d 550, 91 S. Ct. 1250 (1971); *Nathanson v. Weis, Voisin, Cannon, Inc.,* 325 F. Supp. 50 (S.D.N.Y. 1971); *Avery v. Merrill Lynch, Pierce, Fenner & Smith,* 328 F. Supp. 677 (D.D.C. 1971); *Zatz v. Hertz, Neumark & Warner,* 262 F. Supp. 928 (S.D.N.Y. 1966). For these reasons we find RCW 21.20.430(5) coextensive with the rule of in pari delicto and not a statutory bar to relief for petitioners in this case. In addition, since the trial court's remedy was a restitutionary constructive

Public policy is better served by upholding the trial court in this case. The policy implications of our holding are twofold: first, petitioners will be adequately deterred from entering questionable transactions by the scars of this regrettable experience; and second, respondents, who were the primary transgressors of the law with respect to this transaction, will be justly required to disgorge profits accruing to them from their improper behavior.

> The trend of modern jurisprudence is to get away from the technical or literal application of ancient maxims of the law intended to prevent fraud by refusing audience to a party who in his complaint discloses that he himself is tainted with moral turpitude, when its application in the particular case would prove but a cover and shelter for the scoundrel who by falsehood and deceit inveigled the complainant to trust him with his money. In other words, where the ends of public policy will rather be promoted by giving than refusing relief, courts prefer the former. In short, although the complainant may in some degree be in delicto, yet, unless he is also in pari delicto with the defendant, it does not, and should not, follow that the doors of the *temple of justice* should be closed against him."

(Italics ours.)[6] *Wright v. Stewart,* 130 F. 905, 921 (C.C.D. Mo. 1904), *aff'd,* 147 F. 321 (8th Cir.), *cert. denied,* 203 U.S. 590, 51 L. Ed. 330, 27 S. Ct. 777 (1906).

We reverse and remand to the Court of Appeals for consideration of issues not reached because of its disposition of the case.

ROSELLINI, STAFFORD, HICKS, WILLIAMS, and DIMMICK, JJ., concur.

DOLLIVER, J. (dissenting)—While the facts as outlined by the majority need not be repeated, it should be added that the plaintiffs, as pointed out by the Court of Appeals, were

---

trust, the suit need not be seen as one "based on the contract."

[6]With such a personal admonition how could we not follow the advice of our forebears.

offered an opportunity to rescind the transaction and dissolve the partnership but refused. *Golberg v. Sanglier,* 27 Wn. App. 179, 187, 616 P.2d 1239 (1980). I would affirm the Court of Appeals and, thus, dissent.

The courts of this state have consistently refused to enforce illegal contracts (*State v. Northwest Magnesite Co.,* 28 Wn.2d 1, 26, 182 P.2d 643 (1947)) or contracts which grow immediately out of and are connected with an illegal act. *Waring v. Lobdell,* 63 Wn.2d 532, 533, 387 P.2d 979 (1964). The Court of Appeals in refusing to enforce the partnership agreement (1) found it violated "the spirit and policy of [RCW 21.20.010(2)] to deter less than full disclosure of material facts" and (2) was contrary to RCW 21.20-.010(3). *Golberg v. Sanglier, supra* at 195. I agree.

RCW 21.20.010(2) makes it unlawful for any person in connection with the purchase of any security

> [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . .

Sanglier represented to Motors Holding the status of his investment as being his "'own funds, free and clear of any present or future right, claim or interest of any kind.'" *Golberg v. Sanglier, supra* at 192. The majority recognizes "that Sanglier's representation as to the status of his funds was 'material' to the transaction" but argues that the representation was in fact true. Majority opinion, at 879. I believe it is clear that the funds were encumbered and that Sanglier clearly violated RCW 21.20.010(2) in that the facts disclosed were untrue and that the facts omitted were necessary to make the statement made by Sanglier "not misleading". While it is true as found by the trial court that there is "no provision for repayment, or interest on the money invested, and in the event the business failed, neither Sanglier nor the partnership had an obligation to repay plaintiffs' investment", there were restrictions placed on the use of the money. Sanglier was not free to do what he wished with the funds. In the words of the Court of

Appeals:

> [Sanglier's] interest, represented by stock, was required by the partnership agreement to be placed in escrow at the offices of the partnership's attorney or in a safety deposit box held by the partnership. An escrow is a trust, Restatement (Second) of Trusts § 32, comment *d* (1959), and once an instrument is deposited in escrow, it passes beyond the depositor's control, *Lechner v. Halling,* 35 Wn.2d 903, 912, 216 P.2d 179 (1950). The funds were encumbered, *i.e.,* they were subject to the partners' charge upon them, *see* Black's Law Dictionary 908 (4th rev. ed. 1968).

*Sanglier,* at 192–93.

Furthermore, there were clauses governing the sale of the partnership, the procedures to be followed in the event of the death of a partner, and a provision for the return of the investment should Sanglier fail to obtain the dealership. In explanation of these provisions, Mr. Golberg's attorney, in a letter, states:

> 2. . . . [T]hroughout the agreement it has been treated to the effect that John Sanglier has taken a loan from the three contributing partners and that this money shall remain a loan until John Sanglier completely eliminates Motors Holding from Sanglier Cadillac, Inc., at which time he will devote the stocks and notes he holds . . . to the partnership in return for his 25% interest in the profits. If John Sanglier should not be able to complete the Motor Holding Plan for any reason involved, including disqualification or death, his stocks would immediately again be devoted for partnership reasons. *This gives some degree of security to the contributing partners.*

(Italics mine.) The partnership agreement provides:

> *All* stock and notes of Sanglier Cadillac Oldsmobile, Inc. purchased by John Sanglier shall be placed in escrow . . .

(Italics mine.) From this language, the majority somehow concludes that it applies only to future profits and does not operate as an encumbrance on the invested funds. I disagree. The provision states *all* stock. This would include 937 shares of class B common stock and 313 shares of pre-

ferred stock *purchased* by Sanglier with the investment funds. This reasoning is strengthened by further provisions in the letter from Mr. Golberg's attorney in explaining the above provision:

5. This is an extension of the idea that John Sanglier has been loaned the money, which is the case presently, and that he will enter into the contract individually with Motor Holding Division and upon completion of purchasing Motor Holding's interest . . . he will devote the property to partnership purposes. . . . *The protection for the money investing partners will be the escrow of the stock and our offices.*

(Italics mine.) The investing partners wanted and provided for security on their investment; this resulted in an encumbrance upon the funds invested by Sanglier.

What was the purpose of requiring the funds to be unencumbered? Motors Holding wanted the funds free and clear to insure the investor had sufficient self–interest to provide a motivation for the operation's success. *See Golberg v. Sanglier, supra* at 192. General Motors considered this so important that "[a]ny misrepresentation by Sanglier in applying for the dealership . . . provided General Motors with a ground for terminating the dealership." *Golberg,* at 192. Because of the arrangements made by the parties, Sanglier had no incentive to insure the business succeeded as he had no financial stake in the company, a position totally contrary to Motors Holding's desires. The money was encumbered, the misrepresentations were material and are violative of RCW 21.20.010(2) since the only purpose of the partnership was to obtain the dealership and share in subsequent profits.

The argument that the trial court did not consider the funds encumbered is ephemeral. While the trial court felt the misrepresentations were not in violation of state law (*see* conclusion of law No. 12), there is no ineluctable connection between this conclusion and a failure to find that the funds were not encumbered. The majority, however, surmounts this problem by stating that the failure of the

trial court to make a finding that the funds were encumbered "must be interpreted as a finding that the funds were not encumbered since [defendants] had the burden of persuasion in presenting this defense." Majority opinion, at 880, citing *Batten v. Abrams,* 28 Wn. App. 737, 626 P.2d 984 (1981). It seems to me, however, that the question of whether something is encumbered is a matter of law which is concluded from the facts. There is no question but that in fact the partnership agreement required all the stocks and notes of Sanglier Cadillac Oldsmobile, Inc., purchased by Sanglier had to be placed in escrow. It is from this undisputed fact that the legal conclusion that the funds were encumbered should have been drawn.

The majority agrees that the partnership agreement violates RCW 21.20.010(3), which makes illegal "*any* act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." (Italics mine.) *See* majority opinion, at 881. It then goes on to discuss degrees of culpability. This is beside the point. The statute reads "any act". Once it is established that a violation of that law has occurred, no purpose is served by a calculation of the degree of culpability.

Since the contract is illegal and thus unenforceable, there is no need to engage in the discussion as to whether the parties were in pari delicto. I would only observe that to classify plaintiffs as "unwary investors" and to categorize only Sanglier as the "opportunist" in this venture belies the facts.

One final point should be made: I believe that RCW 21.20.430(5), a statute the majority sees fit only to note (*see* majority opinion, at 887), has a bearing on the determination of this case. The statute provides in part:

> No person who has made or engaged in the performance of *any contract in violation of any provision of this chapter* . . . or who has acquired any purported right under any such contract *with knowledge of the facts* by reason of which *its making or performance was in violation, may base any suit on the contract.*

(Italics mine.) RCW 21.20.430(5). It proscribes the enforcement of any contract violative of any provision of the act (the majority concedes Sanglier acted in contravention of RCW 21.20.010(3)) when the parties have knowledge of the facts that render it illegal. The partnership agreement was made by the plaintiffs, who had knowledge of the facts which made the performance a violation of The Securities Act of Washington. In fact, they were warned of the possible problems. An enforcement here would not "eviscerate" the purposes of the act. The Securities Act of Washington seeks to deter only those who *make* or *engage* in the performance of a contract which is in violation of the act, a category into which the plaintiffs surely fall. The majority worries about the "innocent purchaser". When that case arrives, the court can deal with it. That is not the case now before the court.

I dissent and would dismiss the action.

BRACHTENBACH, C.J., and COCHRAN, J. Pro Tem., concur with DOLLIVER, J.

Reconsideration denied June 23, 1982.